Nick KIAHTIPES, Dino Kiahtipes, and Angelo Kiahtipes, Plaintiffs and Appellants,

v.

Marius Henry MILLS and Maxine Mills, Defendants and Respondents.

No. 17528.

Supreme Court of Utah.

May 27, 1982.

Reed L. Martineau, A. Dennis Norton, Craig Stephen Cook, Salt Lake City, for plaintiffs and appellants.

E. J. Skeen, Salt Lake City, for defendants and respondents.

HALL, Chief Justice:

Plaintiffs brought this action for specific performance of an agreement to sell real estate. The trial court refused to enforce the agreement, finding that it contained conditions precedent to the sale which had not been met. Plaintiffs appeal.

In 1976, defendants owned several parcels of land including the "Old Mills Farm" and the "Angelo Peperakis Farm" in Carbon County. Defendants owed debts to four financial institutions in the total amount of approximately $411,000 and had several mortgages on each of their properties as well as on equipment and cattle. Defendants' creditors, concerned about this large indebtedness on the part of defendants, held several meetings to discuss possible means of obtaining payment. In a meeting held on September 10, 1976, it was determined that defendants should sell enough of their land to pay their debt to Utah Farm Production Credit Association (PCA), which constituted the greater part of their indebtedness.

Defendants contacted a local realtor, Jack Marsing, who listed for sale the two Carbon County properties and some other lands of defendants in Duchesne County. Plaintiffs expressed a desire to purchase the Carbon County properties and the parties agreed to have a sales agreement prepared by Therald Jensen, an attorney who had done legal work for both plaintiffs and defendants. Plaintiffs gave Marsing a check in the amount of $5,000 as earnest money.

Defendants notified PCA, which held a first mortgage on the Angelo Peperakis Farm, of the proposed sale. PCA approved the transaction on condition that it receive the entire proceeds of the sale and also agreed to release its mortgage on the property in question after receipt of all the contract payments from plaintiffs. Defendants also contacted Federal Land Bank Association of Provo (FLB), which held a first mortgage on the Old Mills Farm. FLB agreed to release its mortgage on condition that the entire sales proceeds be paid to PCA. After receiving this conditional approval from PCA and FLB, Jensen draft-ed a sales contract containing the following provision:

3. The parties are aware of an outstanding first mortgage on the "Old Mills' Farm" held by the Federal Land Bank of Berkeley, now known as the Federal Land Bank of Sacramento, as well as a first mortgage to the Utah Farm Production Credit Association of Salt Lake City, Utah on the "Angelo Peperakis' Farm" and all of the said water rights. The sellers have orally reported this sale to both of said corporations and have received an oral indication that if this contract is executed between the sellers and buyers, that the said Federal Land Bank will thereupon release its mortgage and that the said Utah Farm Production Credit Association will in writing, agree that when and if all the proceeds payable by the buyers herein shall be paid to and applied on the indebtedness of sellers to said Association, that it will release its mortgage upon the said real property and water right. If within thirty (30) days from the execution of this agreement the Federal Land Bank should decline to release its mortgage or if the said Utah Farm Production Credit Association should decline to execute an agreement in writing agreeing to release its mortgage upon the terms and conditions above set forth, then this sales agreement between the sellers and buyers shall have no further force or effect.

The contract provided for payments by plaintiffs to Zions First National Bank as escrow holder and for remittance of such payments by Zions directly to PCA. The contract also provided:

8. Sellers, at their option, shall furnish either title insurance or an abstract of title on said real property.... If there are any defects in the title to said real property which render the same not marketable, sellers agree to remedy such defects at their cost and expense and within a reasonable time after being notified thereof by buyers.

Plaintiffs and defendants signed the above contract on May 10, 1977. On May

11, defendants, accompanied by Marsing, visited PCA and FLB for the purpose of obtaining final approval of the agreement. Both institutions promptly issued letters confirming such approval. Shortly thereafter, plaintiffs took possession of the property and began to farm it, harvesting two crops of hay from the property during the summer of 1977. However, the sales transaction was never closed.

Plaintiffs claim that until September of 1977 defendants and Jensen led them to believe that the delay in closing resulted from difficulties in obtaining the necessary approval from PCA. According to plaintiffs, they never received the letter written by PCA on May 11, 1977, which confirmed PCA's approval of the transaction and neither defendants nor Jensen ever informed them that this approval had been obtained.

Defendants assert, on the other hand, that the problem which prevented the parties from closing arose from a junior mortgage held on the Carbon County properties by Helper State Bank (HSB). Although the sales contract makes no reference to the HSB mortgage, defendants claim that they did not intend to sell the property in question unless they could obtain a release of the HSB mortgage, as well as of the PCA and FLB mortgages on the property. They further assert that during the time when plaintiffs allegedly believed that the only contract condition remaining to be satisfied was approval of the contract by PCA, defendants and Jensen conducted various negotiations with HSB and their other creditors in an attempt to obtain a release of the HSB mortgage.

In September of 1977, defendants allegedly concluded that it would be impossible to negotiate such a release and they informed plaintiffs that they did not intend to proceed with the sale because of failure of conditions precedent. Plaintiffs filed this suit on October 21, 1977.

The trial court refused to enforce the sales agreement, finding that it was conditioned upon the obtaining of a release of the HSB mortgage and that it accordingly could not be enforced. The court also found that PCA had not agreed in writing to release its mortgage upon receipt of the sales proceeds, as required, and that FLB had not released its mortgage. The court interpreted the contract to require such a written agreement by PCA and such a release by FLB within 30 days as a condition to its enforceability. The court further concluded that:

> There was a mutual mistake of fact as to the existence of the Helper State Bank mortgage and the clearing of the transaction with creditors who had liens upon the land and water stock described in the preliminary agreement.

Plaintiffs dispute the above findings and conclusions.

This Court has stated its standard of review in equity cases as follows:

> [T]his court has both the prerogative and the duty to review and weigh the evidence, and to determine the facts. However, in the practical application of that rule it is well established in our decisional law that due to the advantaged position of the trial court, in close proximity to the parties and the witnesses, there is indulged a presumption of correctness of his findings and judgment, with the burden upon the appellant to show they were in error; and where the evidence is in conflict, we do not upset his findings merely because we may have reviewed the matter differently, but do so only if evidence clearly preponderates against them. [Footnotes omitted.][1]

After a careful review of the evidence in this case, we conclude that it clearly preponderates against the trial court's findings in favor of defendants. We will address individually the dispositive findings and conclusions of that court.

## I

The trial court found that defendants' and Jensen's efforts to obtain a release of the HSB mortgage were made "for the purpose of meeting the conditions of

1. *Del Porto v. Nicolo*, 27 Utah 2d 286, 495 P.2d 811 (1972).

... paragraph 3 of the agreement." However, the agreement contains no reference to the HSB mortgage and no mention of any condition precedent to the sale other than those specified in the above-quoted paragraph 3. Instead, defendants agreed to deliver clear title to the property upon receipt of the required documents from PCA and FLB. Defendants accordingly assumed full responsibility for clearing the property of the HSB mortgage prior to sale and cannot now claim their own failure to do so as an excuse for nonperformance of the contract.[2]

Defendants claim that they intended the sales contract only as a preliminary agreement and that they did not intend to make a final commitment to sell the property until they could arrange for a release of the HSB mortgage. This claim is defeated by the clear language of the contract which states "sellers agree to sell" and contains only the conditions referred to above. Defendants claim that although they were aware of the HSB mortgage, "they relied on the agreement prepared by their lawyer [Jensen], and ... did not realize the significance of the omission [of any reference to the HSB mortgage]." Defendants argue in their brief that Jensen was unaware of the existence of the HSB mortgage at the time he drafted the sales agreement and they imply that if Jensen had known about this mortgage, he would have conditioned the agreement on defendants' obtaining of a release by HSB as well as by the senior mortgage holders. However, according to testimony by both defendants, Jensen did know of the HSB mortgage at the time when he prepared the sales agreement. The evidence unmistakeably establishes that Jensen was present at and actively involved in at least one meeting of all defendants' creditors prior to the date of the agreement. The record also shows that Jensen thoroughly discussed the proposed agreement with Marsing, defendants' real estate agent, who knew of the HSB mortgage. Having been thus informed of the existence of the mortgage, Jensen easily could have made the sales agreement contingent on release of this mortgage if such had been the intention of the parties, but he did not do so.

We find that release of the HSB mortgage was not a condition to the sales agreement of the parties.

## II

The trial court found that the parties' sales agreement depended not only on defendants' success in obtaining a release of the HSB mortgage but on delivery by FLB of a release of mortgage within 30 days of signing. Although FLB issued, promptly following the agreement, a letter approving the agreement and agreeing to release its mortgage, FLB did not issue an actual release of mortgage document. However, the language of the agreement does not require that the actual release document be obtained within 30 days. The pertinent language states:

> If within thirty (30) days from the execution of this agreement the Federal Land Bank should decline to release its mortgage ... , then this sales agreement between the sellers and buyers shall have no further force or effect.

Thus, FLB could have invalidated the agreement at any time during the 30-day period by stating its intention not to release the mortgage; however, not only did FLB fail to "decline," in any way, to issue such a release, but it also expressly reaffirmed its willingness to do so. Defendants presented no evidence of any subsequent change in FLB's attitude toward release of its mortgage, and they cannot legitimately claim that the absence of an actual release document constitutes failure of a condition to the agreement when FLB has expressly committed itself to issue such a release.

---

2. "It is fundamental that a party to a contract should obtain no advantage from the fact that he is himself unable to perform." *Huck v. Hayes*, Utah, 560 P.2d 1124 (1977). See also, *Cahoon v. Cahoon*, Utah, 641 P.2d 140 (1982); *Eliason v. Watts*, Utah, 615 P.2d 427 (1980); *Tanner v. Baadsgaard*, Utah, 612 P.2d 345 (1980); *Ferris v. Jennings*, Utah, 595 P.2d 857 (1979); *Williamson v. Wanlass*, Utah, 545 P.2d 1145 (1976).

## III

■ The trial court further found that PCA had failed to give written approval to the sales agreement, leaving another condition of the agreement unsatisfied. Although it is true that the agreement was contingent on approval by PCA, PCA did give written assurance of its approval. In letters to defendants and to plaintiffs dated May 11, 1977, PCA expressly approved the terms of the sales agreement, which had been reviewed by PCA's legal department. Testimony by representatives of PCA indicates that PCA never withdrew its approval and that it remains ready to approve the sales transaction on condition that it receive all proceeds as provided by the agreement of the parties.

## IV

■ The trial court judged the sales agreement of the parties to be unenforceable not only because of a perceived failure of conditions precedent but because of the existence of a "mutual mistake of fact." The "mistake of fact" referred to by the court appears to consist of defendants' alleged misperception of the effect of the HSB mortgage upon their sales agreement. However, such a mistake, if it existed, would have been neither mutual nor a mistake of fact. It is clear that even if defendants themselves misunderstood the legal effect of the contract, this misunderstanding was not shared by plaintiffs and hence was not mutual. This fact does not in itself defeat defendants' "mistake" argument, since unilateral as well as mutual mistakes occasionally may provide the basis for rescission of contracts. However, the mistake doctrine applies only to mistakes concerning existing fact and not to errors in the legal interpretation of a document.[3]

■ As to the alleged "mistake" itself, defendants have offered no evidence other than their own testimony to show that they intended release of the HSB mortgage to be

a condition to the contract. According to three witnesses, defendants' attempts to negotiate a release of the HSB mortgage subsequent to the signing of the agreement appeared to be prompted by defendants' general desire to resolve their financial problems rather than by any belief that the sale of their Carbon County properties depended on such a release. Stanley Litizette, attorney for HSB, testified as follows concerning a July 29, 1977, meeting between defendant M. Henry Mills and his creditors:

Q  Stan, you didn't understand that there was a potential sale between Kiahtipes and Mr. Mills at these meetings?

\*     \*     \*     \*     \*     \*

... At the second one you didn't understand that at all?

A  I did not understand that at all.

Q  Let me ask you this: Was Helper State Bank, to your knowledge, ever asked to release that mortgage with respect to the property that was being sold to Mr. Kiahtipes?

A  Not to my knowledge.

\*     \*     \*     \*     \*     \*

My notes do not disclose anything other than the whole agreement being to refinance with Farmers Home Administration.

Q  Take everyone out?

A  That's what my notes say, yes.

Q  But not with regards to the Kiahtipes-Mills transaction?

A  No. I don't remember of any relative releases as against Production Credit, Federal Land Bank with the Helper State Bank.

\*     \*     \*     \*     \*     \*

Q  Okeh. Now at any time before the end of 1977, to your knowledge was Helper State Bank asked to release only the property that was involved in the sale to Kiahtipes?

**3.** *Hurt v. Leatherby Insurance Co.,* Fla., 354 So.2d 918 (D.C.App.1978); *Miller v. Frankfort Bottle Gas, Inc.,* 136 Ind.App. 456, 202 N.E.2d 395 (1964); *Quinn v. Briggs,* 172 Mont. 468, 565 P.2d 297 (1977); *Farina v. Calvary Hill Cemetery,* Tex., 566 S.W.2d 650 (Ct.Civ.App.1978); *Century 21 All Western Real Estate and Investment Inc. v. Webb,* Utah, 645 P.2d 52 (1982).

A I was never asked by Mr. Holdaway or anyone else to release any of the security.

Q Well, ... to your knowledge was Helper State Bank ever asked to release property that was involved in the sale to Kiahtipes?

A I don't know.

Litizette also testified as follows concerning a meeting on July 1, 1977:

Q Okeh, so Helper State Bank, in connection with that proposal, was not being asked to release anything?

A Not to my knowledge, nor do my notes disclose any such request.

Loile Bailey, former branch manager of PCA, stated in a deposition published by the court that he, like Litizette, had failed to receive any indication from defendants that they believed the existence of the HSB mortgage to be an obstacle to closing. Bailey testified as follows:

Q And at the time you left [the employ of PCA on June 30, 1977], was it your understanding that the PCA had approved the sale, and you were just waiting for the sale to be consummated?

A That's right.

Q Was there any other development while you were there that you are aware of that we haven't talked about with regard to the Mills?

A No.

Jensen himself testified that he did not remember any mention during the course of defendants' discussions with HSB of the proposed sale to plaintiffs and that these discussions had focused on the problem of defendants' overall indebtedness rather than on the particular HSB mortgage covering defendants' Carbon County property:

Q Now, was Helper State Bank asked to release a lien on ... the property that was being sold to Kiahtipes?

A I don't recall that.

Q Do you recall them being asked to release a lien on the [Carbon County] land, in connection with this refinancing arrangement that was being proposed and discussed?

A Well, at these meetings, I don't think they were asked that. They might have been; I don't remember that, but I don't think that was the object of the meetings was [sic] to come out and ask and come out and point the finger at them and say, "Now, you release this one." There was discussion as to what might be done, see.

Q Okeh. It was a discussion of how Mr. Mills' [sic] might be best preserved; is that right?

A Well, I don't know whether it was Mr. Mills' position but there was a discussion as to how these lending institutions could get their money.

The sales agreement contains no ambiguity which might justify defendants' alleged mistaken interpretation. It clearly sets forth the two conditions agreed upon by the parties: release of the FLB mortgage and a written agreement to release by PCA. Defendants have offered no explanation of why they expressly included these two conditions and at the same time omitted any reference to a similar condition which they claim to have intended as part of the contract. The parties' express reference to the FLB and PCA mortgages shows that they specifically considered the encumbrances on the property during the preparation of the agreement and that the omission of any condition relating to the HSB mortgage was intentional. In a separate paragraph, defendants expressly agreed to cure all title defects in the property, thus assuming responsibility for clearing the property of encumbrances. It is difficult to see how defendants could have read and signed the contract and still maintained the impression that they could entirely escape their obligations thereunder in the event that any difficulty should arise in connection with the HSB mortgage.

In conclusion, we hold that the parties executed a valid contract on May 10, 1977, influenced by no mistake of fact. This agreement bound defendants to sell the property in question unless either PCA or FLB declined within 30 days to accept the contract terms. Neither of those institu-

tions ever has expressed any dissatisfaction with the terms of the contract and both PCA and FLB have committed themselves in writing to release their first mortgages on the property upon compliance with those terms. Thus, all conditions to performance of the contract have been satisfied and plaintiffs are entitled to full performance.

Reversed. Costs to plaintiffs.

OAKS, HOWE and DURHAM, JJ., concur.

STEWART, J., concurs in the result.