Dwaine C. HORTON, Plaintiff
and Respondent,

v.

Virginia H. HORTON, Majestic Investment Company of Denver dba Majestic Mortgage Company and Granite Title Company, and Herbert Halliday, Defendants and Appellants,

and

All other persons, unknown claiming any right, title, estate, lien or interest in the real property described in plaintiff's complaint adverse to plaintiff's ownership, or any cloud upon plaintiff's title thereto, or interest therein.

No. 18712.

Supreme Court of Utah.

Dec. 4, 1984.

Arthur H. Nielsen, Clark R. Nielsen, Salt Lake City, for Majestic Inv. Co.

Walter P. Faber, Salt Lake City, for Granite Title Co.

James R. Blakesley, Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice:

Defendant Majestic Investment Company of Denver dba Majestic Mortgage Company (Majestic) appeals from a district court judgment setting aside a quitclaim deed from plaintiff Dwaine C. Horton to defendant Virginia Horton as void *ab initio*. Majestic also appeals a determination that plaintiff's interest in the subject property has priority over Majestic's interest. We affirm.

During their marriage, plaintiff Dwaine C. Horton and defendant Virginia H. Horton acquired a house in Bountiful, Utah. In December 1977, as part of a divorce decree, Mrs. Horton was awarded title to the house subject to an equity interest of $30,000 in Mr. Horton due and owing to him at the time his children left home or reached age 21. Mr. Horton's name remained on the title to secure his interest. In May 1978, Mrs. Horton sought a loan from First Security Bank to build a swimming pool and retaining wall and to complete landscaping around the house. The bank advised Mrs. Horton that Mr. Horton's signature would be required on the loan documents since he was a record titleholder. Mr. Horton refused to sign the papers for some time, but after pressure from Mrs. Horton and his children, a threat of legal action by Mrs. Horton to force him to sign and advice from his attorney, Dwaine Horton agreed to sign a deed of trust with Mrs. Horton to obtain a loan of $35,000.

Mrs. Horton used only a portion of the borrowed money for construction and landscaping purposes. The remainder, $20,000,

was lent to a small business with which she was involved. Within ten days after the loan, the business went under and the proprietor left the country with the money. In order to pay off the construction and landscaping creditors, Mrs. Horton, in September 1978, arranged a second loan from Murray First Thrift for the sum of $51,000. Mr. Horton again agreed to subordinate his lien and signed the loan application. Mrs. Horton used $20,000 from this loan to pay off her outstanding bills. The remaining $30,000 was invested in another company with which Mrs. Horton was involved called Geo-Thermal Electric Company.

While seeking a business loan for Geo-Thermal at Deseret Financial in Ogden, Mrs. Horton was urged by her business colleagues and by Dix Buckway and John Larry, officers of Deseret Financial, to obtain a consolidation loan of $112,500 for the purposes of paying off the first two house loans and of having additional money to invest in Geo-Thermal. Mrs. Horton agreed to do this and pursued the consolidation loan. Deseret Financial was unable to make the loan, so Buckway arranged with Erwin Rohleder to broker the loan through Majestic.

Rohleder was not employed by Majestic at that time, but was negotiating for a job. Since Majestic did not allow nonemployees to broker loans for the firm, an employee and friend of Rohleder's, Patrick Vaculin, manager of Majestic's Salt Lake office, was the official broker. Majestic prepared all of the documents for the loan, and Majestic offices were used for signing them. Rohleder, however, handled the entire transaction and received a fee for his services. He was later employed by Majestic.

Mrs. Horton received the consolidation loan in her own name, a quitclaim deed from Mr. Horton to Mrs. Horton having somehow been obtained. Mrs. Horton paid off the loans to First Security and Murray First Thrift and, for unexplained reasons, paid John Larry of Deseret Financial $10,000 for having cosigned the consolidation loan and paid Dix Buckway of Deseret Financial a fee for processing the loan.

Mrs. Horton ended up with approximately $7,000, which was immediately invested in Geo-Thermal. Geo-Thermal very soon thereafter went out of business, and Mrs. Horton's invested funds were lost. Deseret Financial also went bankrupt soon thereafter, and neither Buckway nor Larry was available at trial.

The testimony as to how, when and where the quitclaim deed was obtained from Mr. Horton is at odds. Mr. Horton testified that although the signature on the deed was his, he had never seen that deed, had never intended to sign such a deed or to give up his interest in the property, and did not do so knowingly. He further testified that at the meeting with Rohleder and Mrs. Horton he was given a stack of papers to sign, which he was led to believe by Rohleder and his wife were the final papers for the Murray First Thrift loan, and that the top paper was a loan document. He repeatedly stated that he had trusted his wife and believed he could rely on her representations. Mrs. Horton testified that she knew nothing about the quitclaim deed until Rohleder called her and told her he had it and could process the loan without the need for Horton to sign. Mrs. Horton further testified that she had no intention of having Horton give up his interest in the house or sign a quitclaim deed. She specifically testified that she thought that since the house was appraised for $200,000, even in the event of foreclosure on the $112,500 loan, Mr. Horton's $30,000 interest was secure. Rohleder testified that the deed, dated November 21, 1978, was signed in Majestic's office that night after he, Rohleder, had explained the deed very carefully to Horton. Rohleder admitted that the deed was not acknowledged in the presence of a notary, but claimed that it was notarized the night it was signed. Both Mr. and Mrs. Horton testified that the night they were in Majestic's office was November 1, 1978, not November 21, the date on the deed. The date was significant to both because it was the night before Mr. Horton was to remarry, which he did on November 2. Further, both Mr. and Mrs. Horton testified that it was important that Horton sign

the loan papers before his remarriage since his wife-to-be was opposed to his signing any more loan documents for the benefit of Mrs. Horton after Horton was married to the new Mrs. Horton. The deed recited that Horton was an unmarried man, which he was not on November 21.

The notary, Shelly Busha Fry, in a published deposition, testified that she had prepared the quitclaim deed, along with other loan papers, and had given them to Rohleder all together in a file. She also testified that in fact the deed was not notarized the night the Hortons were in Majestic's office, but sometime later and that it was not signed in her presence. Mrs. Horton admits to filling in Mr. Horton's name on the acknowledgment line.

In 1980, Mrs. Horton was unable to meet her mortgage payments, and Majestic proceeded to foreclose on the trust deed. A default judgment was obtained against Mrs. Horton, and the house was sold at a proper trustee's sale.

Mr. Horton learned of the foreclosure proceedings from his son and, in the process, learned, allegedly for the first time, of the quitclaim deed and the third loan. Mr. Horton filed this action, claiming that the quitclaim deed was obtained from him by fraud and misrepresentation and should therefore be set aside and his equity interest in the house should be recognized. At trial, only three witnesses testified: Mr. Horton, Mrs. Horton and Erwin Rohleder. The trial court found that neither Mr. nor Mrs. Horton knew of the quitclaim deed at the time it was signed and did not intend to have Mr. Horton execute and deliver the quitclaim deed or give up his interest in the property. The court therefore ruled that the quitclaim deed was void *ab initio* and

that Mr. Horton's interest had priority over Majestic's interest.

On appeal, Majestic first argues that the findings of the trial court finding fraud and setting aside the deed were not supported by clear and convincing evidence.[1] An action to avoid a deed is one in equity.[2] Therefore, this Court can review and weigh the evidence.[3] However, the standard of appellate review in equity cases, even where the level of the proof in the trial court is clear and convincing evidence, is that of clear preponderance.[4] Therefore, where the evidence is in conflict this Court will not upset the findings in the trial court unless the evidence so clearly preponderates against them that this Court is convinced that a manifest injustice has been done.[5] We do not find that to be the case here.

A finding of fraud must be based on the existence of all of its essential elements, i.e., a false representation of an existing material fact made knowingly or recklessly for the purpose of inducing reliance thereon, upon which there was reliance to the innocent party's detriment.[6] The trial court found the existence of all of these elements in this case. The evidence clearly supports the findings made. The trial court did not abuse its discretion by choosing to believe the testimony of the Hortons rather than the contradictory testimony of Rohleder and finding that the deed was obtained fraudulently.

Majestic also argues that the trial court found the quitclaim deed void based on the lack of proper acknowledgment. This argument evidences a misunderstanding of the court's findings. The trial court clearly found that the deed should be set aside based on fraud in its making. The court's

1. *See, e.g., Rasmussen v. Olsen,* Utah, 583 P.2d 50 (1978).

2. *Del Porto v. Nicolo,* 27 Utah 2d 286, 495 P.2d 811 (1972).

3. *Id.*

4. *Bown v. Loveland,* Utah, 678 P.2d 292 (1984); *Abbott v. Christensen,* Utah, 660 P.2d 254 (1983).

5. *Hatch v. Bastian,* Utah, 567 P.2d 1100 (1977). *See also Kiahtipes v. Mills,* Utah, 649 P.2d 9 (1982); *Nicolo, supra* note 2.

6. *Sugarhouse Finance Co. v. Anderson,* Utah, 610 P.2d 1369 (1980); *Taylor v. Gasor, Inc.,* Utah, 607 P.2d 293 (1980).

finding with regard to the lack of acknowledgment is a finding that goes to and supports the finding of fraud.

The trial court also found however that neither Mr. Horton nor Mrs. Horton intended to have Mr. Horton execute and deliver a quitclaim deed or to have him give up his equity interest in the property.

█ The evidence also clearly supports the finding that there was no delivery of the deed. In *Poulsen v. Poulsen*,[7] a case markedly similar in its pertinent facts, this Court held that where the quitclaim deed was not duly acknowledged there was no presumption of delivery.[8] In that case, there was evidence that both the date and the typed version of the grantor's name were added sometime after the signature. Further, there was evidence that the signature was not contemporaneously notarized and that the grantor did not appear before the notary who purported to take the acknowledgment. The Court therefore held that the deed was not duly acknowledged. The Court went on to hold, based on the facts of that case, that the grantor had met her burden of proof of no delivery.

Similar evidence is found in the record in this case. Both Hortons testified that the date on the deed was not the date they met with Rohleder. Mrs. Horton testified that she added Horton's name in the acknowledgment space sometime after that meeting. All the witnesses agreed that Horton did not appear before the notary and that the deed was not contemporaneously notarized.

█ Delivery or its absence is a question of fact.[9] On review of questions of fact, this Court views the evidence and all the inferences that can reasonably be drawn therefrom in a light most supportive of the trial court's findings.[10] Those findings will not be disturbed when they are based on substantial, competent and admissible evidence.[11]

The evidence presented by Majestic is that Rohleder and Mr. and Mrs. Horton were present when Horton signed the deed and that it was properly notarized immediately thereafter. Rohleder testified that he explained the quitclaim deed to Horton and told both parties that the loan would not go through with Horton's name on the title. However, both Hortons testified that, while loan papers were signed at that meeting, no deed was signed or was intended to be signed and no explanation of a quitclaim deed was made. Rohleder admitted Mrs. Horton told him that after she knew of the quitclaim deed she still intended Horton to get his money. Horton suggested that the deed had been deliberately mixed in with the loan papers he was signing. Further, the notary never saw the deed signed and notarized the deed sometime after the signing, with Mrs. Horton filling in the acknowledgment section.

Based on the above testimony and more, the trial court's findings were founded in substantial evidence and should not be disturbed. While we note that there was some evidence of delivery of the deed, the trial judge did not abuse his discretion by choosing to believe the testimony of the Hortons rather than the contradictory testimony of Rohleder.

█ Finally, Majestic contends that its mortgaged interest should not be subordinated to Horton's equity interest. Majestic argues that even if the deed was not valid as a conveyance it nevertheless should be construed as an equitable mortgage to Majestic since Horton went to Majestic's office with the intent to sign loan papers and therefore with the intent to subordinate his interest to Majestic's interest. This argument has no merit. To say that a deed fraudulently obtained and set aside could serve as an equitable mortgage simply because Horton subordinated his interest on two previous loans and, at the time the

---

**7.** Utah, 672 P.2d 97 (1983).

**8.** *Id.* at 99.

**9.** *Id.*

**10.** *Id.* at 100.

**11.** *Id.*

deed was signed, was apparently signing loan papers stretches the bounds of reason. The issue before the trial court was not whether Horton intended to subordinate his interest in the first two loans, but whether he intended to subordinate his interest in the third, much larger loan.

 In any event, the burden of proof is on the party claiming equitable mortgage, here Majestic, to show by clear and convincing evidence that the conveyance was *intended* as a mortgage.[12] Majestic failed to meet this burden. The trial court found that Horton intended to subordinate his interest only to First Security and Murray First Thrift and that the loan from Majestic to Virginia Horton was made without Horton's knowledge or consent. The evidence does not clearly preponderate[13] against the findings of the court on this issue.

In fact, it is undisputed that Mr. Horton subordinated his interest to First Security and Murray First Thrift in order to acquire loans of $35,000 and $51,000 respectively. The balances owing on these two loans plus interest ($86,700) were paid from the proceeds of the Majestic loan. Thus, as a result of the fraudulent conveyance, Mr. Horton's debt was cleared.

 It is not the intent of equity actions such as this to punish a transgressor or to permit any party, whether innocent or not, to reap a benefit from the fraudulent transaction that he would not have reaped if the transaction had not taken place.[14] The purpose of an equity action is to restore the parties to the status quo to the extent possible.[15]

 It is generally accepted that he who seeks equity must do equity.[16] Thus, in order that the fraudulently acquired

quitclaim deed be set aside and Mr. Horton's interest in the subject property restored to him, Mr. Horton must, to the extent possible, return to Majestic the benefits received by him that he otherwise would not have received. If Majestic had not paid off the balances owing on the two loans from First Security and Murray First Thrift to which Mr. Horton had voluntarily subordinated his $30,000 equity interest, Horton's interest would still be subordinated to that amount.

Thus, equity requires that Majestic, having paid $86,700 to retire the mortgages to First Security and Murray First Thrift, should have priority over Mr. Horton to the extent of that amount.

The case is remanded to the trial court for modification of judgment in accordance with this opinion.

DURHAM, J., and JUDITH M. BILLINGS, District Judge, concur.

HOWE, Justice (concurring and dissenting):

I concur in restoring Mr. Horton to his former position which was subordinate to the two earlier mortgages. He should not reap the benefit of the Majestic loan which extinguished the two prior mortgage balances. We recognized this principle in *Rosenthyne v. Matthews-McCulloch Co.*, 51 Utah 38, 168 P. 957 (1917), where we held that a plaintiff, in equity and good conscience, should repay as a condition precedent to having a deed set aside and cancelled amounts paid by the grantee on the mortgage. We explained that ordinarily courts of equity before rescinding deeds, contracts or other instruments endeavor to place the parties to the transaction in their

---

**12.** *Loveland, supra* note 4. *See also Baker v. Taggart,* Utah, 628 P.2d 1283 (1981).

**13.** *See supra* note 4.

**14.** *Pan Am. Petroleum & Transp. Co. v. United States,* 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734 (1927); *Ehrlich v. United States,* 252 F.2d 772 (5th Cir.1958); *Rosenthyne v. Matthews-McCulloch Co.,* 51 Utah 38, 168 P. 957 (1917).

**15.** *Id. See also* 13 Am.Jur.2d *Cancellation of Instruments* § 37 (1964).

**16.** *Coleman Co. v. Southwest Field Irrigation Co.,* Utah, 584 P.2d 883 (1978); *Carbon Canal Co. v. Sanpete Water Users Ass'n,* 19 Utah 2d 6, 425 P.2d 405 (1967).

former positions and will not permit one of them to reap the benefit from the transaction. Another good example of the application of this rule (but based on an equitable lien theory) is found in *Houston v. Mentelos*, Fla.App., 318 So.2d 427 (1975). There the court found that a land owner's signature on a warranty deed was obtained by misrepresentation. The grantee had meanwhile obtained a $55,000 mortgage loan on the property. The court set aside both the warranty deed and the subsequent mortgage, but gave the mortgagee an equitable lien for $20,936.72 which he had expended in satisfying liens which encumbered the property at the time of the conveyance. *See generally* 12A C.J.S. *Cancellation of Instruments* § 53, which states that the rule requiring restoration applies irrespective of the ground on which cancellation is sought, "be it for fraud, mistake, misrepresentation, duress, nonperformance, undue influence, or want of consideration." In the instant case, Majestic Mortgage, having paid from the proceeds of its mortgage loan some $86,700 to retire prior mortgages to which Mr. Horton had voluntarily subordinated his $30,000 equity interest, should have priority over Mr. Horton to the extent of that amount.

I would go further, however, and reverse the trial court's judgment setting aside the quitclaim deed. I, therefore, dissent from the refusal of the majority to do so. Contrary to the majority opinion, the trial court did not find that Majestic Mortgage defrauded Mr. Horton into signing the quitclaim deed. Neither did the trial court find the existence of all the elements of fraud as stated by the majority. The finding of the court relating to the signing of the deed was that "when plaintiff signed said quitclaim deed, he was led to believe he was signing something other than the quitclaim deed." It can hardly be contended that this constitutes a finding of fraud, with all its elements, on the part of Majestic Mortgage. Another finding states that the defendant Granite Title Company, which insured the mortgage executed to Majestic, did not know or have reason to know of the "fraudulent circumstances"

surrounding the signing of said quitclaim deed. Again, that finding is conclusory and is completely devoid of a finding on the necessary elements of a fraud cause of action. Further, it fails to specify by whom and on whom the fraud was practiced. That finding apparently relates only to the cross claim of Majestic against Granite Title, although another finding characterizes Majestic's conduct as "negligence."

More importantly, Mr. Horton's own testimony refutes any possible finding of fraud. He testified that he went to the office of Majestic Mortgage thinking that he was going to sign certain loan papers which would make a permanent loan out of the $51,000 loan he and his ex-wife had earlier made with Murray First Thrift. Mrs. Horton met him at the front door, and together they went into an office where she introduced him to Mr. Rohleder. They all sat down at a large desk and Mr. Horton was presented with papers to be signed. They talked a few moments, and he signed them. Mrs. Horton showed him where to sign and took them from him as he signed each one. He read only the paper on top, which he remembered as being a "loan paper." He thought that paper had the figure $51,000 on it. He admitted that his signature was on the quitclaim deed, but he testified that he did not look at the upper part of the deed when he signed it.

He further testified that there was no conversation regarding a quitclaim deed or a third loan. He read only the top paper and was satisfied that it was a loan. He did not ask any questions of Mrs. Horton or of Mr. Rohleder. He had no conversation with Mr. Rohleder. When he signed the quitclaim deed, he remembered seeing his name typed beneath the signature line. He admitted that he had full opportunity to read any and all documents, but he did not read them because he had complete trust in Mrs. Horton. He further admitted that he was unconcerned with what the documents were. He did not then object to a loan against the property because the value of

the home had increased and he felt secure even if a foreclosure resulted.

Mrs. Horton testified that when the second loan, or MFT loan, was obtained, she told him that she would later be getting a long-term loan. Soon thereafter she told him that she was getting a loan for $112,-000 because it had to be large enough to pay off the two existing loans. She was present with Mr. Horton when he signed the papers at Mr. Rohleder's desk. She did not pay much attention to them, but sat back and let him sign. She wrote in his name in the acknowledgment section of the quitclaim deed.

The testimony of Mr. and Mrs. Horton simply does not support a finding of fraud on the part of Majestic. Instead, it portrays Mr. Horton as an unconcerned person who signed a paper or papers presented to him without anyone explaining them to him, without his asking any questions and without his reading them, although he had full opportunity to do so. Neither of them claimed that Majestic made any representations whatever to him as to what he was signing. This cannot be fraud. I would not set aside the deed.

I cannot agree with the statement in the majority opinion that somehow because Mr. Horton did not personally appear before the notary "that goes to and supports the finding of fraud." Neither can I agree that the deed is defective beause the acknowledgment was not made before the notary at the time it was signed. A deed is valid between the parties thereto without an acknowledgment and as to all other persons who have had actual notice, U.C.A., 1953, § 57–1–6, et seq.; Murray v. Beal, 23 Utah 548, 65 P. 726 (1901). Furthermore, an acknowledgment may be made before a notary at any time subsequent to signing and does not need to be made contemporaneously with the signing. Section 57–2–1, et seq. The majority confuses acknowledgment with attestation. They are not the same act although they can be accomplished at the same time. Thus there is nothing about the acknowl-

edgment in this case which aids the plaintiff.

As to the question of delivery of the deed, it is true that Mr. Horton testified that he did not ever have the intent to sign and deliver a quitclaim deed. However, in view of his testimony that he had every opportunity to read each and every paper that he signed, that no one said anything to him concerning the contents of the documents and that he asked no questions of anyone concerning them, he is not entitled to the equitable relief of cancellation of the deed because of his own negligence. *Hennessy v. Holmes*, 46 Mont. 89, 125 P. 132 (1912); *Golle v. State Bank of Wilson Creek, et al.,* 52 Wash. 437, 100 P. 984 (1909); *Powers v. Powers,* 46 Or. 479, 80 P. 1058 (1905); *Snelgrove v. Earl,* 17 Utah 321, 53 P. 1017 (1898). If written documents are to have any sanctity at all in the law, courts should not set them aside because the signer did not read them nor ask for an explanation and then later contends that he had no intent to sign and deliver those documents.

STEWART, J., concurs in the concurring and dissenting opinion of HOWE, J.

ZIMMERMAN, J., does not participate herein.