**ROBERT LANGSTON, LTD., Plaintiff and Respondent,**

v.

**L. Gurr McQUARRIE, Defendant and Appellant,**

**Robert Langston, individually and as general partner of Robert Langston, Ltd., et al., Defendants and Respondents.**

**L. Gurr McQUARRIE, Third-Party Plaintiff,**

v.

**SECURITY TITLE CO. OF SOUTHERN UTAH, Third-Party Defendant.**

No. 860036–CA.

Court of Appeals of Utah.

Aug. 25, 1987.

Rehearing Denied Oct. 6, 1987.

James A. McIntyre, Kerry P. Eagan, McIntyre, Dennis & Egan, P.C., Salt Lake City, for McQuarrie.

Kevin J. Sutterfield, Salt Lake City, D. David Lambert, Howard, Lewis & Peterson, Provo, for United Farm.

David Nuffer, Snow & Nuffer, St. George, for Langston.

Bryce Roe, Fabian & Clendinen, Salt Lake City, for Security Title Co.

Timothy B. Anderson, Jones, Waldo, Holbrook & McDonough, St. George, for John Rex.

Before ORME, GREENWOOD and BILLINGS, JJ.

ORME, Judge:

Appellant McQuarrie seeks reversal of the trial court's decision granting rescission of a contract for the sale of land leases, grazing permits, and cattle from respondent Langston to McQuarrie. McQuarrie also seeks reformation of the contract and specific performance of the reformed contract. United Farm Agency cross appeals, seeking a commission based on a listing agreement it had with Langston. We affirm Langston's judgment against McQuarrie with one modification and reverse the judgment of no cause of action entered against United Farm Agency.

## FACTUAL BACKGROUND

On February 24, 1980, McQuarrie and Langston entered into a written contract for the sale of some or all of Langston's ranching operation known as the Last Chance Allotment. The "Deposit Receipt and Agreement of Sale" listed the property to be sold as certain Bureau of Land Management grazing permits, range worthy cattle at the prices per head stated in the agreement, and other items of personal property. The purchase price of $620,000 —$380,000 for the BLM permits and an estimated $240,000 for the cattle—was to be paid as follows: $10,000 as earnest money; $145,000 down payment due on April 15, 1980; and equal annual installment payments of $59,724 payable April 15, 1981 and yearly thereafter until the entire balance was paid in full.

At the time the agreement was signed, the parties agreed that a cattle count would be conducted to determine the exact number of cattle on the ranch, which would enable a final price to be calculated for the cattle. Neither the fact of the cattle count nor the timing or mechanics for the procedure were included in the contract. Because of the inaccessibility of the Last Chance Allotment, the parties were unable to perform the cattle count until late May and early June of 1980.

Many of the documents necessary to complete the sale, including quit claim deeds and trust deeds for the permits, were executed by the parties prior to the cattle count. All transactions necessary to finalize the sale were, apparently, complete upon the execution of these documents, with the important exceptions of the final cattle count, execution of a bill of sale for the cattle, and transfer of possession of the real and personal property subject to the contract.

The cattle count began on May 23, 1980 and continued until June 9, 1980. McQuarrie's son Martin was present through most of the counting but left the ranch before

the count was completed. Although written tally sheets were kept to reflect the total number of cattle,[1] some of the green paint that was used to mark the cattle as they were counted rubbed off, and some of the cattle were counted twice. All parties stipulated at trial that the total number of cattle reflected on the tally sheets equalled 246, despite entries for more than 300, because of the double counting. The parties disagreed as to whether the tally sheets in evidence were all the tally sheets taken.

In June 1980, McQuarrie visited the ranch and acknowledged that he did not have the $145,000 down payment then past due, but offered to pay $30,000. Langston did not accept the lesser amount.

At about this time, McQuarrie began to suspect that Langston had continued removing cattle from the ranch after the earnest money agreement was executed. McQuarrie then repudiated the arrangement, sending the following note to Langston, through his broker:

> Please be informed that we are pulling out of the deal. Mr. Langston needs to tend his property. Appropriate refund of earnest money would be your only requirement.

Langston did not return the earnest money. Instead, he filed a lawsuit seeking judicial foreclosure of the trust deeds. McQuarrie counterclaimed for damages because of Langston's failure to perform under the agreement and Langston's misrepresentations concerning the actual number and value of the cattle, the condition of the personal property, and the number of valid grazing leases held by Langston. McQuarrie also counterclaimed for specific performance of the sale agreement and requested the court to adjust the purchase price to reflect the value of property Langston was unable to deliver in accordance with the agreement. Langston later amended his complaint to state a claim for rescission.[2]

Three and one-half years after the action was commenced, trial was held. After hearing the evidence, the trial court declared the contract rescinded and, to return the parties to the status quo, declared the documents executed pursuant thereto void. (It did not, however, order restoration of McQuarrie's earnest money and certain grazing fees he had paid.) The court based its rescission of the contract primarily on a theory of mutual mistake. The trial court found that 285 cattle at prices shown for each type of cattle on the sale agreement were mutually assumed and that they were agreed to have a total approximate purchase price of $240,000.[3] "There was no anticipation by the parties that less than 285 cattle would be present or counted, nor was there any anticipation that the money owing for cattle would vary, except in a slight degree, from $240,000." According to the court's findings, the parties were mutually mistaken as to the price and terms set by the contract.

On appeal, McQuarrie argues that the court erred in granting rescission, and that the documents should be reformed to reflect the actual number and value of the

---

1. Some of the original tally sheets were no more than ear tag numbers written in pencil on the back of used envelopes and other scraps of paper.

2. McQuarrie argues that Langston elected the remedy of foreclosure, which barred Langston's later assertion of mutual mistake and claim for rescission. McQuarrie's argument is without merit. "The doctrine of election of remedies is a technical rule of procedure and its purpose is not to prevent recourse to any remedy, but to prevent double redress for a single wrong." *Angelos v. First Interstate Bank of Utah,* 671 P.2d 772, 778 (Utah 1983) (quoting *Royal Resources, Inc. v. Gibralter Financial Corp.,* 603 P.2d 793, 796 (Utah 1979)). Langston never sought double recovery; he merely changed his legal theo-

ry and form of recovery. *See, e.g., Earven v. Smith,* 127 Ariz. 354, 621 P.2d 41, 43 (Ariz.App. 1980) (commencement of action on promissory note not conclusive of election of remedy and did not bar later claim of rescission on cattle contract). McQuarrie himself has also asserted inconsistent theories, first seeking rescission of the agreement through his letter, and then seeking specific performance in this action.

3. Langston and McQuarrie testified that at the time of signing, they assumed there were approximately 285 cattle, but this number is not shown on the written agreement. However, the agreement provided for the sale of 285 BLM permits, and Langston could only run one cow per permit on the range.

cattle and then enforced. United Farm Agency cross appeals, seeking a commission based on a listing agreement between its agent John Rex and Langston.

## MUTUAL MISTAKE

■ A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain. *Bailey v. Ewing*, 105 Idaho 636, 671 P.2d 1099, 1102 (Idaho App.1983). The trial court found that the parties were mistaken as to the number of the cattle actually on the Last Chance Allotment (only 246 were shown by the exhibits) and also as to the price and terms. The crux of the mistake is this: If there had been 285 cattle as Langston and McQuarrie both assumed, they could not have totalled $240,000 at the listed prices unless all but a handful of the cattle were bulls.[4] There was also some confusion about what permits were being sold. The contract listed the BLM permits as being located in Garfield County. Unknown to the parties at the time of execution of the agreement, the state grazing lease in Garfield County had been cancelled in 1976. Langston had obtained, and was using in connection with the operation of the ranch, other leases which were not described in the sale agreement. The quit claim deeds Langston gave McQuarrie were for grazing leases in Kane and Garfield counties.[5]

■ Mutual mistake of fact makes a contract voidable, *see Tanner v. District Judges*, 649 P.2d 5, 6 (Utah 1982), and is a basis for equitable rescission. *Tarrant v. Monson*, 96 Nev. 844, 619 P.2d 1210, 1211 (Nev.1980). We find the trial court was acting within its discretion to rescind the sale agreement in view of its adequately supported findings concerning mutual mistake.[6] *See* 12A C.J.S. *Cancellation of Instruments* § 7 (1980) (allowance or denial of rescission remedy rests in the sound discretion of the trial court). *See also Horton v. Horton*, 695 P.2d 102, 105 (Utah 1984).

■ However, once the trial court rescinded the contract, it was, as it recognized, obligated to return the parties to their pre-contract position, if possible. *Busch v. Nervik*, 38 Wash.App. 541, 687 P.2d 872, 876 (1984). *See Perry v. Woodall*, 20 Utah 2d 399, 401, 438 P.2d 813, 815 (1968) (one electing to rescind a contract must tender back to other contracting party whatever property of value he has received); *Horton v. Horton*, 695 P.2d 102, 107 (Utah 1984) ("The purpose of an equity action is to restore the parties to the status quo to the extent possible."). Accordingly, to complete the restitution which properly accompanies rescission, Langston is required to reimburse McQuarrie for the $10,000 earnest money fee and the grazing fees McQuarrie paid.

## BROKER COMMISSION

Under the terms of the exclusive listing agreement, Rex and United Farm Agency

---

**4.** The contract calls for the sale of four kinds of cattle at stated prices: yearling heifers at $450, cows with calves "or coming with" calves at $750, dry cows at $500, and bulls at $1,000.

**5.** All of the problems arising from this transaction could have been avoided by use of a detailed, clearly drafted sale agreement, instead of the short fill-in-the-blank form which was used. *See Callister v. Millstream Assocs.*, 738 P.2d 662, 664 (Utah Ct.App.1987) (Use of short, general, fill-in-the-blank forms to govern expensive or complicated transactions is all but a guaranty of loopholes.). The parties could have allocated the risk of a substantially lower number of cattle, or at least made provisions for altering the total cost of the cattle or the individual prices, depending upon the essence of the contract. On appeal, Langston argues that the deal was to sell all the cattle—whatever was there—for approxi-

mately $240,000. McQuarrie argues that the deal was to sell cattle at the listed prices, whatever the total cost might be. No such disparity of opinion would be possible if a suitable contract had been prepared.

**6.** At oral argument, attention was given to whether the written contract was ambiguous so as to permit the trial court's foray into the realm of extrinsic evidence. *See, e.g., Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985); *Seashore's, Inc. v. Hancey*, 738 P.2d 645 (Ct.App. 1987). That focus was misplaced since extrinsic evidence was considered not to divine the contractual intent of the parties, but rather to show the existence of mutual mistake. *See, e.g., Bailey v. Ewing*, 105 Idaho 636, 671 P.2d 1099, 1104 (Idaho App.1983) (extrinsic evidence properly admitted to prove mutual mistake on the part of the parties).

were entitled to a commission when: 1) a purchaser was procured at the stated price and terms, or 2) a purchase was procured at any other price and terms acceptable to the seller. Apparently relying on its analysis that mutual mistake warranted rescission of the contract, the trial court concluded that no purchaser was found within the terms of the listing agreement. This analysis confuses Langston's contractual obligations to McQuarrie, the buyer, with Langston's separate contractual obligations to the real estate agency.

The general rule accepted in Utah is that a broker has earned his commission upon the procuring of a buyer who is ready, willing and able and who is accepted by the seller. *Bushnell Real Estate, Inc. v. Nielson*, 672 P.2d 746, 751 (Utah 1983). Absent a contractual provision which conditions the right to a commission on the performance or part performance of the buyer,[7] the broker is not an insurer of the subsequent performance of the contract and is not deprived of his right to a commission by the failure or refusal of the buyer to perform. *Id.* *See, e.g., F.M.A. Financial Corp. v. Build, Inc.*, 17 Utah 2d 80, 83–84, 404 P.2d 670, 672 (1965) (broker cannot be held as insurer against the possibility that the buyer may become dissatisfied with his bargain and bring a lawsuit claiming the right of rescission). In the present case, Rex, a United Farm agent, procured in McQuarrie a purchaser who, at that time, was ready, willing, and able. McQuarrie signed a sale agreement with Langston. He paid $10,000 towards his purchase obligation. He executed documents and initially participated in the cat-

tle count. If he could secure reformation of the contract, he would still like to have the contract performed.

The trial court found that Rex, although inexperienced as a real estate agent, was not negligent and was not guilty of bad faith or breach of trust.[8] United Farm Agency was likewise found to be without fault. Once the agency met its obligation under the exclusive listing agreement, it is irrelevant that McQuarrie later failed to complete his payment obligation or that the sale agreement was rescinded years later. The listing agreement entitles Rex and United Farm to a commission of $38,000.[9] Rex and United Farm have already received a portion of the commission due from the initial earnest money, which should be subtracted from the amount due.

The court's basic disposition as between Langston and McQuarrie is affirmed, with remand for the entry of judgment in favor of McQuarrie in the amount of the earnest money and the grazing fees. The court's judgment as between Langston and Rex/United Farm is reversed, with remand for the entry of judgment against Langston in the amount indicated. All parties shall bear their own costs of appeal and cross-appeal.

BILLINGS and GREENWOOD, JJ., concur.

---

7. In this case, no such language was included. The language of the listing agreement parroted the language of *Bushnell.* Paragraph B of the agreement provides: "You are employed on an exclusive basis to procure a purchaser, ready, willing and able to buy said property at the price and upon terms as stated herein or as otherwise subsequently authorized by me, and to accept and give receipt for any money or deposits received in connection with the sale of said property."

8. While such a finding, at least as to negligence, is certainly questionable in view of Rex's appar-

ent role in the preparation of the grossly deficient sale contract, it is not challenged on this appeal by Langston.

9. The listing agreement provided for a 10% commission on the sale price of the land leases and grazing permits, a total of $380,000. There was no mention of the cattle in the listing agreement and accordingly no commission was earned on the failed cattle sale.