JOHN P. LANGEVELD, PLAINTIFF-RESPONDENT, v. L. R. Z. H. CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, *ET AL.*, DEFENDANTS, AND JOSEPH A. HIGGINS, SR., DEFENDANT-APPELLANT.

Argued January 24, 1977—Decided July 21, 1977.

Mr. *Donald J. Rapson* argued the cause for appellant (*Messrs. Lautman, Rapson* and *Henderson,* attorneys).

Mr. *Robert E. McGuire* argued the cause for respondent (*Messrs. Randall, Randall* and *McGuire,* attorneys).

The opinion of the court was delivered by

MOUNTAIN, J. This case presents an important question of commercial law requiring the interpretation of *N. J. S. A.* 12A:3–606, a section of the Uniform Commercial Code which we have not hitherto been called upon to consider.

In the trial court, summary judgment in the amount of $57,500, together with interest, was entered against defendant Higgins,[1] 130 *N. J. Super.* 486 (Ch. Div. 1974). The Appellate Division affirmed, substantially for the reasons expressed by the court below. 137 *N. J. Super.* 557 (App. Div. 1975). We granted defendant's petition for certification. 70 *N. J.* 511 (1976).

On March 10, 1972, defendant, L. R. Z. H. Corporation, made and delivered to plaintiff, Langeveld, its promissory

---

[1] The term "defendant," as used hereafter in this opinion will, unless otherwise indicated, refer to defendant Higgins.

note in the sum of $57,500. The indebtedness evidenced by the note was secured by a mortgage in like amount on land in Montvale in Bergen County owned by the defendant corporation. This mortgage was junior in lien to a first mortgage in the sum of $825,000 held by The Howard Savings Institution and to a second mortgage in the approximate amount of $58,000 held by persons named Castellane. The latter mortgage covered only a portion of the whole tract upon which The Howard Savings and Langeveld mortgages were liens. By an instrument of guaranty set forth at the foot of the note, defendant, together with certain other persons not here involved, undertook to become individually obligated for the payment of the debt. The note matured February 15, 1973 and was not paid.

It was then for the first time discovered, apparently by defendant, that the Langeveld mortgage had never been recorded. Upon this being brought to plaintiff's attention, the instrument was forthwith recorded on March 1, 1973. It then developed that between the execution and delivery of the Langeveld mortgage on March 10, 1972 and the recording of the instrument on March 1, 1973, the following lien claims had become a matter of record:

1. Mortgage by L. R. Z. H. Corporation to James E. Hanson and Company in the amount of $100,000.

2. Mechanic's Notices of Intention filed by Reed Electric Corporation in the total sum of $111,825.48.

3. Mechanic's Notice of Intention filed by Samuel Braen and Company in the sum of $12,804.56.

On March 8, 1973 plaintiff instituted this suit on the guaranty. In defense of the claim thus asserted against him, defendant pointed out that there existed here the tripartite arrangement typical of a suretyship relationship.[2]

[2]Suretyship is invariably a tripartite relationship in which the obligation of the surety is intended to supplement an obligation of the principal (also described as the debtor or obligor) owed to the creditor (also described as the obligee). [*Clark, Suretyship in the Uniform Commercial Code,* 46 *Tex. L. Rev.* 453 (1968)]

L. R. Z. H. Corporation was principal debtor. Plaintiff was its creditor; defendant stood in the position of a guarantor or surety. He further called attention to the fact that plaintiff, as such creditor, held the mortgage from L. R. Z. H. Corporation as collateral security for the corporate obligation and that it owed a duty to him, as surety for the same debt, to protect this security and allow nothing to occur to impair its value and worth that reasonable effort and foresight on plaintiff's part could prevent or avoid. Failure to record the mortgage for about a year, predictably followed by the intervention of recorded liens in substantial amounts, constituted, he argued, a failure on plaintiff's part to fulfill this duty. Accordingly, concluded defendant, he should be released from all liability on his guaranty. Particular attention was drawn to a section of the Uniform Commercial Code, which in pertinent part reads,

*Impairment of Recourse or of Collateral.*
(1)    The holder discharges any party to the instrument to the extent that without such party's consent the holder
*          *          *          *          *          *          *          *
(b)    unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

[*N. J. S. A.* 12A:3–606]

Doctrines and rules taken from the common law of suretyship have been incorporated within various provisions of the Uniform Commercial Code. It has been said that "[s]ection 3–606 is probably the most important provision in the Code to the surety." *Clark, Suretyship in the Uniform Commercial Code, supra,* 46 *Tex. L. Rev.* at 457. "Perhaps the most significant provision of the UCC affecting suretyship is section 3–606." Note, *Suretyship in Article 3 of the Uniform Commercial Code,* 17 *West. Reserve L. Rev.* 318 (1965).

It is a well-recognized principle of the law of suretyship that a release of collateral held by a creditor, or its impairment by improper action or inaction on his part, will

extinguish the obligation of the surety, at least to the extent of the value of the security released or impaired. This rule has come to be accepted as the law of our State. *Van Hoesen v. Gelfen,* 103 *N. J. Eq.* 234, 238 (Ch. 1928), aff'd, 110 *N. J. Eq.* 69 (E. & A. 1931); *St. Paul Fire & Marine Ins. Co. v. New Jersey Bank & Trust Co.,* 104 *N. J. Super.* 367, 370–71 (Law Div. 1969), rev. on other grounds, 137 *N. J. Super.* 294 (App. Div. 1971), certif. denied, 59 *N. J.* 265 (1971). The section of the Uniform Commercial Code we are considering is essentially a restatement of this rule, as the courts that have examined it have consistently held. *Peoples Bank of Point Pleasant v. Pied Piper Retreat, Inc.,* 209 *S. E.* 2d 573 (W. Va. 1974); *Shaffer v. Davidson,* 445 *P.* 2d 13 (Wyo. 1968); *White v. Household Finance Corp.,* 302 *N. E.* 2d 828 (Ind. App. 1973); *Beneficial Finance Co. v. Marshall,* 551 *P.* 2d 315 (Okla. App. 1976); *First Bank & Trust Co., Palatine v. Post,* 10 *Ill. App.* 3d 127, 293 *N. E.* 2d 907 (1973).

█ The doctrine is an equitable one, designed to protect the surety's right of subrogation. Upon paying the debt, the surety is, as a matter of law, subrogated to all the creditor's rights against the principal debtor and is entitled to all benefits derivable from any security of the principal debtor that may be in the creditor's hands. The rule forbidding impairment of collateral has as its chief aim the protection of these potential benefits made available through subrogation.

█ Defendant has made out a prima facie case to support his contention that he comes within the favor of the rule. Relating his contentions to the language of the act clearly demonstrates that this is so. Thus we see that plaintiff is the "holder" of collateral, as the word is used in the statute. Defendant is a "party to the instrument"[3] in his

---

[3]Since the guaranty is appended at the foot of the note, we are not called upon to decide whether any different result might ensue were the guaranty to take the form of a separate document. Sup-

capacity as guarantor. A failure to record a mortgage held as collateral security—absent waiver, estoppel or the like— seems clearly to be an instance of unjustifiable impairment. Common law authorities so held, almost without exception. See, for instance, *Rose v. Homsey,* 347 *Mass.* 259, 197 *N. E.* 2d 603 (1964); *Nebraska State Bank v. May,* 117 *Neb.* 262, 220 *N. W.* 276 (1928); *Bennett v. Taylor,* 43 *Tex. Civ. App.* 30, 93 *S. W.* 704 (1906); *Redlon v. Heath,* 59 *Kan.* 225, 52 *P.* 862 (1898); *Sullivan v. State,* 59 *Ark.* 47, 26 *S. W.* 194 (1894). *Cf. Ammerman v. Miller,* 159 *U. S. App. D. C.* 385, 488 *F.* 2d 1285, 1295 (1973). The mortgage is "collateral for the instrument" (note) "given by [a] person (L. R. Z. H. Corporation) against whom he (Higgins) has a right of recourse."

Plaintiff essentially disputes defendant's position on two grounds. He urges, first, that the guaranty is unconditional in form and that this being so, the alleged impairment of collateral in no way affects the obligation to which the guaranty gives rise. In the second place he contends that there has in fact been no impairment of collateral, or at least none that has caused defendant to suffer loss.

██ The form of guaranty appears below.[4] The provisions dispensing with presentment, notice of dishonor and protest add nothing not already provided by the Code.

---

porting the view that the result should be the same, see *Murray, Secured Transactions – Defenses of Impairment and Improper Care of Collateral,* 79 *Com. L. Jour.* 265, 267 (1974) (collecting authorities).

[4]To induce the said JOHN P. LANGEVELD to accept the above note, the undersigned hereby guaranty performance of all obligations of the obligors under the note and under the mortgage securing the indebtedness described in the note. The said undersigned guarantors agree to be principally liable on the indebtedness jointly and severally and further agree to their obligation jointly and severally without the necessity of presentment, demand or notice of dishonor. The undersigned guarantors agree to pay the tenor of this instrument notwithstanding that L. R. Z. H. CORPORATION may effectuate an assignment for the benefit of creditors, be declared a

> When words of guaranty are used presentment, notice of dishonor and protest are not necessary to charge the user.
>
> [*N. J. S. A.* 12A:3–416(5)]

The language assuring continued liability on the part of the guarantor in the event of the obligor's insolvency was likewise superfluous. Such liability would continue in the face of this eventuality whether explicitly so stated or not.

The only expression which may be said at all to support plaintiff's contention is found in the words, "[t]he said undersigned guarantors agree to be *principally* liable on the indebtedness. . . ." (emphasis added). Plaintiff argues that this language justified him in treating Higgins as if he were in every sense a principal. This contention must be carefully examined. To accept plaintiff's argument literally would be to deprive defendant of all right of recourse against the true principal, or at the very least render the right of recourse of uncertain value by permitting the impairment of collateral. This result should be permitted only where the instrument of guaranty specifically frees the creditor from liability for such impairment.

> If the destruction or impairment of such a right [subrogation to unimpaired collateral] is to be waived by a guarantor, it should only be by the most unequivocal language in the guaranty agree-

bankrupt, be discharged from Bankruptcy, or otherwise be excused, except by payment, of the debt.

> /s/ Joseph A. Higgins, Sr.   L.S.
> JOSEPH A. HIGGINS, SR.
> /s/ Albin H. Rothe   L.S.
> ALBIN H. ROTHE
> /s/ Louis J. Zoghby   L.S.
> LOUIS J. ZOGHBY

In addition to the guaranty itself, the following paragraph of the note should be considered,

The undersigned and all other parties who at any time may be liable hereon in any capacity, jointly and severally waive present- ment, demand for payment, protest and notice of protest of this note, and authorize the holder hereof, without notice to grant ex- tensions in the time of payment and reductions in the rate of in- terest on any moneys owing on this note.

ment. The right does not originate in contract, and it cannot lightly be destroyed by contract. [*D. W. Jaquays & Co. v. First Security Bank*, 101 *Ariz.* 301, 419 *P.* 2d 85, 89 (1966)]

Here, there has been no unequivocal waiver. We think the wording of this guaranty may fairly be equated with language purporting to make a person in defendant's position an "unconditional guarantor." Such language is normally held to permit the creditor to move against the guarantor without first proceeding either against the principal debtor or the collateral. It is not customarily interpreted as providing a creditor with any further rights. As one commentator has put it,

It is one thing to say that a creditor need not pursue the collateral as a condition precedent to pursuing the guarantor of payment and quite another to say that because of this condition precedent the creditor can by misfeasance or nonfeasance prevent the guarantor of payment from ever recovering from the collateral. [*Murray, Secured Transactions — Defenses of Impairment and Improper Care of Collateral, supra*, 79 *Com. L. Jour.* at 278]

Recent case law expressly sustains the position that terms of absolute or unconditional guaranty should be so limited. *See Behlen Mfg. Co. v. First National Bank of Englewood*, 472 *P.* 2d 703 (Colo. App. 1970) (payment "absolutely and unconditionally" guaranteed) ; *First National Bank of Grand Forks v. Haugen Ford, Inc.*, 219 *N. W.* 2d 847 (N. D. 1974) ; *Custom Leasing, Inc. v. Carlson Stapler & Shippers Supply, Inc.*, 195 *Neb.* 292, 237 *N. W.* 2d 645 (1976).

The point to be made and emphasized is that absent express agreement, waiver or renunciation, a surety's right of subrogation to *unimpaired* collateral will be protected. We do not find this right to have been waived or relinquished by anything contained in this guaranty.

Plaintiff's second contention is that the collateral has not as a matter of fact been impaired, or at least not to an extent that it has caused defendant any loss.

On March 9 and 20, 1973, James E. Hanson and Company and The Howard Savings Institution commenced

separate actions to foreclose their respective mortgages. On July 3, 1973 an order was entered consolidating the two foreclosure suits. On August 26, 1974, at sheriff's sale, Higgins, acting through a corporation, purchased the property for $1,080,000. By this time the amounts due on The Howard Savings and Castellane mortgages had substantially increased. The sum received at sheriff's sale was sufficient only to satisfy the amount due on the first mortgage and to apply about $20,000 in reduction of the second. The trial judge took the position that the amount received at sheriff's sale represented the fair market value of the premises. Since it was insufficient to satisfy the two mortgages admittedly senior to plaintiff's mortgage, this demonstrated that plaintiff's mortgage was without value. Therefore, although he found that plaintiff's failure to record his mortgage was "unjustifiable," the trial judge concluded that this had not harmed Higgins because the Langeveld mortgage had now been shown to be valueless. Accordingly, plaintiff's motion for summary judgment was granted. We find this disposition of the case to have been error.

In the first place, and most importantly, the factual situation and the respective rights and obligations of the parties should have been assessed and determined not at the time of the sheriff's sale, in August, 1974, but rather at the time the obligation matured, in February, 1973. It was then that defendant was entitled to exercise his rights as surety. Had he paid plaintiff the amount then due — $57,500, together with interest at the rate of 10% from October 15, 1970 — he would have stood in plaintiff's shoes as holder of the note and mortgage. Had the mortgage originally been promptly recorded, as it should have been, there would then have been available to him a variety of options, the relative merits of which we are in no position to evaluate at this time and on this record. For instance, as holder of a junior lien (the Langeveld mortgage) he would have had a right to redeem either or both The Howard Savings and Castellane mortgages. *Osborne, Law of Mortgages,* 628–29. He could

have foreclosed any mortgage acquired. Other possibilities suggest themselves. The point is that defendant appears to have been deprived of the opportunity effectively to exploit his right of subrogation to unimpaired collateral by the failure of plaintiff to record the mortgage given him by L. R. Z. H. Corporation.

The Hanson mortgage as well as various mechanics' notices of intention had intervened before the Langeveld mortgage was recorded. Although the Hanson mortgage is said to contain a clause subordinating it to the lien of the Langeveld mortgage, Hanson has nevertheless filed various contentious pleadings apparently attacking the alleged priority of plaintiff's lien. Reed Electric Company claims to have been junior in lien only to The Howard Savings Institution and complains that the relative priority of its claim has *never* been adjudicated. These points of contention and others as well should have been resolved at trial. The facts so found should have then been assayed to determine their effect, if any, with respect to the alleged impairment of collateral. The case was in no way ripe for the entry of summary judgment.

The parties express sharply differing views as to the extent to which an impairment of collateral should be held to discharge one secondarily liable. Defendant suggests that the Code has adopted the rule, sometimes referred to as that of *strictissimi juris,* that a surety is completely discharged by any impairment of collateral, whether or not he has sustained loss or prejudice. Plaintiff, on the other hand, contends that the surety should only be released from liability to the extent that actual, calculable monetary loss can be shown to have occurred.

██ We think the statute should be read as adopting a rule somewhere between these extremes. If the impairment of collateral can be measured in monetary terms, then the calculated amount of the impairment will ordinarily measure the extent of the surety's discharge. But there are factual situations — this may or may not be one of them — where a surety may be able to establish that he has sustained preju-

dice, but be unable to measure the extent of the prejudice in terms of monetary loss. Where such a situation is presented the surety will normally be completely discharged.[5]

To recapitulate briefly, at the plenary hearing which must follow our order of remand, the Chancery Division judge will determine from all of the evidence presented, to what extent, if at all, plaintiff's failure seasonably to record his mortgage impaired the collateral given by L. R. Z. H. Corporation to plaintiff as security for the indebtedness. The effect of the impairment upon one secondarily liable may or may not be translatable into dollars. There may be clear prejudice without precisely calculable loss. This will normally result in the discharge of the surety. To the extent that such impairment is found, defendant, Higgins will stand discharged of his obligation as guarantor.

The judgment of the Appellate Division is reversed and the case is remanded to the Chancery Division for further proceedings not inconsistent with what has been said above.

---

[5]Our dissenting colleague argues that this Court should enter judgment for the defendant rather than direct a remand to the trial court. In so doing he places reliance upon language found in *Bell v. Martin*, 18 *N. J. L.* 167 (Sup. Ct. 1840). That case involved the question as to whether a binding agreement between the creditor and the principal debtor to extend the time of payment would discharge one who was secondarily liable. The case held, in accordance with well settled authority, that such an extension agreement *did* result in the discharge of a surety. This rule was later embodied in the Negotiable Instruments Law, *N. J. S. A.* 7:2–120. This statute was expressly repealed by the Uniform Commercial Code, *N. J. S. A.* 12A: 10–105, but the subject matter of the earlier act was carried forward into *N. J. S. A.* 12A:3–606(1)(a). The discussion of "prejudice" in *Bell* was clearly unnecessary to the decision. Where a surety seeks to be discharged because of a binding agreement to extend time, neither loss nor prejudice need be shown. "Although application of the rule to cases where the extension of time appears to have caused little or no actual injury to the surety has been criticized, it is nevertheless firmly settled." *Simpson, Law of Suretyship* 352. Where the surety, however, seeks to be discharged because of an alleged impairment of collateral as is here the case, a quite different situation is presented.

CONFORD, P. J. A. D., Temporarily Assigned, concurring in part and dissenting in part. I am in agreement with the Court's determination that summary judgment should not have been entered for plaintiff. I take issue, however, with the Court's failure to direct the entry of summary judgment in favor of defendant on the ground of impairment by plaintiff of the collateral for defendant's obligation as surety on the note in suit.

There is some support in the history of the adoption of Section 3.606 of the Uniform Commercial Code for defendant's contention that its intent was to entitle a surety to discharge upon impairment of recourse or of collateral without having to demonstrate either prejudice or actual loss. Prior to the promulgation of the official version of the Code in 1958 (later adopted in New Jersey) the New York Law Revision Commission made a full study of the 1952 draft code. It is generally believed that certain alterations of the draft code were attributable to recommendations of the New York Commission.[1] See Uniform Commercial Code in Uniform Laws Annotated (Master edition 1968) Explanation, p. iii. The New York Commission concluded that Section 3–601 (1) of the code adopted the strict rule of suretyship, not requiring a showing of prejudice to the surety. 2 *New York Law Revision Commission Report, op. cit. supra,* at 1179. Also adverting to the study and conclusion of the New York Commission in this regard was the Supreme Court of Oregon in *Philco Finance Co. v. Palton,* 248 *Or.* 310, 432 *P.* 2d 686, 689, n. 7 (1967).

Notwithstanding the foregoing legislative history, I agree with the Court's view that as a matter of sound policy we should not adopt the principle of *strictissimi juris* in this

[1]For example, the Commission recommended deletion of a Comment to Section 3–606 (1) declaring there would be a *pro tanto* discharge of the surety upon partial release or impairment of security. See 2 New York Law Revision Report, 1189–1190 (1955). The official draft adopted that recommendation.

regard but that a surety should be entitled to relief if he is "able to establish that he has sustained prejudice", even if the prejudice cannot be measured "in terms of monetary loss". pp. 56–57. But apparently the Court and I do not share a common understanding of the meaning of the word "prejudice" in this respect since I view the record on the motion for summary judgment as conclusively establishing prejudice to defendant in plaintiff's failure to have promptly recorded the Langeveld mortgage while the Court holds that a plenary hearing is necessary to establish prejudice. In this regard, the legislative history aforementioned at least militates against an approach which would unduly circumscribe the surety in establishing prejudice by an impairment of collateral.

I am in full accord with the Court's assertion that the question of prejudice must be assessed as of the time the note matured, in February 1973. It cannot be left to the hindsight of events as they later unfolded and as they apparently stood in August 1974, when the sheriff's sale took place. pp. 55–56. What must be appraised and compared, in order to determine whether defendant was prejudiced, are the hypothetical situation which defendant would have faced on the maturity date had the Langeveld mortgage been timely recorded, on the one hand, and the actual situation which in fact confronted him on that date, on the other hand. That actual situation consisted of the fact that the mortgage had not been recorded, and three new liens had been recorded in the interim, apparently assuming priority to the Langeveld mortgage, to which defendant was subrogated as a surety.

As of the maturity date, had plaintiff's mortgage been a good and subsisting mortgage ahead of any other liens except the first two mortgages (which it was not, because it had not been recorded until March 1, 1973), defendant as surety would have been entitled to pay off the Langeveld mortgage and assume a position of priority to the later intervening liens, i. e., the Hanson mortgage of $100,000, the

Reed Electric Corporation mechanic's notice of $111,000 and the Samuel Braen mechanic's notice of $12,000. He could then have paid or refinanced the first two mortgages at the amount due in March 1973. He would not have had to wait until completion of the foreclosure of The Howard Savings mortgage, necessary, as it turned out, because of the contending claims for priority of the other lienors, and he would have been able to save the additional interest which accrued on the first (Howard Savings) mortgage between February 15, 1973 (maturity of Langeveld note) and August 26, 1974 (sheriff's sale).

As well stated in the Court's opinion, "defendant appears to have been deprived of the opportunity effectively to exploit his right of subrogation to unimpaired collateral by the failure of plaintiff to record the mortgage given him by L.R.Z.H. Corporation." pp. 55–56.

"Prejudice" is adequately established, in my view, by the substantial possibility of a worsened position of the surety due to the impairment of the collateral by the creditor. The surety does not have to show the certainty of loss from the impairment in order to demonstrate prejudice. Frequently, as in this case, the course of events makes it impossible to establish actual loss to a certainty or even a reasonable probability thereof. It should be enough that it is reasonably possible that the surety has been disadvantaged. Comparable views were articulated as long ago as 1840 in *Bell v. Martin,* 18 *N. J. L.* 167 (Sup. Ct.), holding that, in order to discharge an endorser because of a creditor's agreement to extend time to the debtor, such extension need only be to the "prejudice" of the endorser. The court said: "But this does not mean to his *actual, ascertained loss or injury*: but to his prejudice, in contemplation of law; by depriving him of his right to take up the note, and sue the prior indorsers, or the maker, until after the expiration of the extended credit, given by the holder." (*Id.* at 170; emphasis in original). The court goes on to explain that any other rule would "subvert the very foundations, upon which the

whole system of commercial paper has been erected". (*Id.* at 170–171).

Since it is impossible to rerun the course of events and discover to a certainty what defendant, as surety, would have done at maturity of the note if the Langeveld mortgage had been recorded immediately upon execution, rather than delayed to a date letting in other encumbrances ahead of it, it seems to me that prejudice must be assumed on these facts, as a matter of law, on the basis of what defendant would have had the right to do at that time in protection of his interests. I do not see how any facts plaintiff might conceivably adduce at a hearing could affect the validity of the foregoing observations. *Cf. Merchants Ind. Corp. v. Eggleston, 37 N. J.* 114 (1962), dealing with "prejudice" as an essential ingredient of estoppel when an insurance company maintains control of the defense of a liability action against its insured, and later denies coverage. In that connection the court said (*Id.* at 129) : "Indeed some courts speak of a 'conclusive' presumption of prejudice, doubtless because, since the course cannot be rerun, they believe it futile to attempt to prove or to disprove that the insured would have fared better on his own."

Procedurally, entry of summary judgment for defendant at this time would be supportable since defendant did earlier make a motion for summary judgment before a different judge which was denied, and he repeats the request for that relief on this appeal. This Court has the right to assume original jurisdiction in order to bring the litigation to a conclusion, *R.* 2:10–5, and plaintiff has been fully heard on the issues.

*For reversal and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER—6.

*Concurring in part and dissenting in part*—Judge CONFORD—1.