UTAH FARM PRODUCTION CREDIT
ASSOCIATION, Plaintiff and
Appellant,

v.

Milo W. WATTS, Cleown W. Watts, Buford L. Gregory, Elizabeth A. Gregory, Agricultural Stabilization and Conservation Service, Commodity Credit Corporation, an agency of the United States Dept. of Agriculture, Scott Stevenson and Burns Pump Service, and Paul Farthing, dba Paul Farthing Grading Contractor, Defendants and Respondents.

No. 19380.

Supreme Court of Utah.

March 23, 1987.

James R. Brown, Kevin E. Anderson, Salt Lake City, for Utah Farm Production Credit Ass'n.

Robert C. Cummings, Salt Lake City for Watts.

Christopher A. Johnson, for Gregory.

LeRay G. Jackson, Delta, for Farthing.

Steven R. Jackson, Delta, for Stevenson and Burns.

HALL, Chief Justice:

In April 1980, Utah Farm Production Credit Association (PCA) sued Milo W. Watts and Cleown W. Watts (Wattses) and Buford L. Gregory and Elizabeth A. Gregory (Gregorys) for payment of three promissory notes signed by the Wattses and the Gregorys and to foreclose a mortgage securing repayment of the notes. The other defendants have claims against a portion of the mortgaged property. PCA also sought payment of an unsecured promissory note executed only by the Gregorys and to foreclose an alleged security interest in crops and equipment. The Wattses in turn sued the Gregorys to enforce a uniform real estate contract. In June 1983, the trial court ruled on PCA's and the Wattses' cross-motions for summary judgment. The court ruled in favor of the Wattses. We reverse.

## I

PCA is a lending institution that finances its owners' agricultural ventures. In 1947, the Wattses began borrowing PCA funds. The Wattses' loans have been secured by mortgages in favor of PCA covering several parcels of land that now collectively constitute the Wattses' 1,366–acre ranch (ranch) in Kanosh, Utah. The last recorded mortgage on the ranch in favor of PCA was filed in August 1974 and includes a future advances clause.

In August 1978, the Wattses sold Buford Gregory a 481–acre hay and grain farm (farm) and related equipment on a uniform real estate contract for $369,000. The farm is part of the 1,366 acres the Wattses mortgaged to PCA. The contract provided in part that the Gregorys were to assume the Wattses' $74,343.65 outstanding loan balance with PCA.

At about the time of the sale, PCA apparently loaned the Wattses $20,000 to operate the farm. The loan application and other evidence indicate that the funds were to benefit the Gregorys to some extent. This $20,000, together with the Wattses' existing obligation ($74,343.65) and interest, was written into a new obligation due in January 1979. Although the application indicated that both the Gregorys and the Wattses were to execute the necessary promissory note, the note was signed only by the Wattses.

In January 1979, the PCA debt, which now amounted to $104,884, came due. Another loan application was executed. A loan officer recommended on the application that financing be continued. The recommendation further suggested that the Wattses continue to be liable on the loan and that their property continue to be used as collateral.[1] On January 8, 1979, a letter was sent to the Gregorys advising that a $198,519 loan had been approved. This loan, in part, included $82,700 for the farm's 1979 operating budget, the prior obligation that had become due, and interest. Both the Wattses and the Gregorys signed the promissory note for this loan.

In March 1979, the Gregorys were in need of a building loan. The loan was made by PCA, and a promissory note in the amount of $20,000 was signed by the Wattses and the Gregorys. In June 1979, the Gregorys again obtained funds from PCA after signing an installment note for $38,890 and assigning their equity in the farm to PCA. In August 1979, the Gregorys needed additional funds to provide interim financing for the farm and living expenses. A promissory note in the amount of $48,890 was signed by the Gregorys and the Wattses.

In 1980, the Gregorys abandoned the farm. The Wattses operated the farm in the summer of 1980 under an agreement with PCA. In April 1980, PCA brought an action on the notes to foreclose upon the mortgage and a purported security interest. In August 1980, PCA sought summary judgment, which was denied. In July 1981, PCA entered into a release agreement with the Gregorys for satisfaction of the Gregory note, the Gregory/Watts notes, and any deficiency after foreclosure. This agreement also preserved the right of PCA to either take a deed in lieu of foreclosure of the Gregorys' interest in the farm or continue the foreclosure proceedings and have a stipulated judgment of foreclosure on the Gregorys' interest in the farm.

Discovery continued by the parties, and in October 1981, PCA filed a second motion for summary judgment which was partially granted in a minute entry but was never signed by the court. On December 7, 1981, the Wattses filed their motion for summary judgment as against PCA. PCA filed its cross-motion for summary judgment on December 9, 1981. In May 1983, the Wattses also sought summary judgment against the Gregorys. After argument, additional memoranda and discovery were filed with the court. The trial judge denied PCA's motion and granted summary judgment in

---

**1.** Since the farm was being sold to the Gregorys on a contract, legal title was in the Wattses' names.

favor of the Wattses, both as to PCA and as against the Gregorys on the cross-claim. The trial court ruled that the Wattses were accommodation makers and were discharged by PCA's release of the Gregorys.

## II

PCA's first point is that a genuine issue of material fact exists as to whether the Wattses were "accommodation makers" and that therefore the trial court erred in granting the Wattses' motion for summary judgment. PCA contends that its evidentiary exhibits submitted in opposition to the Wattses' motion demonstrate that such an issue of fact exists.

In its brief, PCA claims that as far *as it is concerned,* the Wattses "never just lent" their credit to the Gregorys. PCA states that it believed the Wattses to be the members, the makers, and the owners of the security and therefore the primary borrowers in the transaction before us. PCA argues that this intent is well established by the affidavits it submitted below. In particular, PCA relies upon the affidavits of three former PCA employees, Wood, Naylor, and Mills. A review of the affidavits supports this contention.

However, the Wattses' brief correctly points out that they filed a motion to have these and other affidavits stricken. Inasmuch as the trial court granted the Wattses' motion for summary judgment, which must be considered improper if the motions to strike were not granted, the judgment presumably granted the Wattses' motions to strike.[2]

To determine the validity of PCA's affidavits, we examine the Wattses' objections raised in their motions to strike.[3] The primary objection made in the Wattses' motions to strike was to the various affiants' alleged lack of personal knowledge concerning the sworn matters. We have repeatedly held that an opposing affidavit under Utah Rule of Civil Procedure 56(e) (Repl. Vol. 9B, 1977 ed.) must be made on personal knowledge of the affiant and must set forth facts that would be admissible in evidence and facts showing that the affiant is competent to testify to the matters stated therein.[4]

When reviewing the validity of an affidavit made on behalf of a corporation (plaintiff is a federally chartered corporation), a distinction is made between those affidavits made by mere corporate agents and those made by agents who are also corporate officers. Where an affidavit is made by an officer, it is generally considered to be the affidavit of the corporation itself.[5] "An officer must, of course, be possessed of the requisite knowledge, but such knowledge on his part is presumed."[6] However, the requisites are more stringent for judging the sufficiency of affidavits executed on behalf of a corporation by an agent of the corporation who is not a corporate officer. For example, the personal knowledge of such an agent regarding the facts to which he has sworn will generally not be presumed, and therefore, the specific "means and sources" of his information should be shown.[7]

Affiant Richard Wood stated that he acted as a loan officer during the 1979–80 period, during which time he examined, analyzed, and recommended approval of the

---

2. *Compare Bailey v. Sound Lab, Inc.,* 694 P.2d 1043, 1044 (Utah 1984) (post-judgment motion filed but not ruled upon, dismissed, or withdrawn is still pending where record did not support the view that appellants abandoned their motion), *with Zions First Nat. Bank v. C'Est Bon Venture,* 613 P.2d 515, 517 (Utah 1980) (respondent's oral motion, which had not been ruled upon prior to judgment, deemed implicitly denied by judgment which did not give effect to motion).

3. *See Great Barrington Sav. Bank v. Gens,* 8 Mass.App.Ct. 942, 942–43, 397 N.E.2d 1130, 1131 (1979) (court upheld trial court's granting of summary judgment where defendant's affidavits failed for sufficiency and thus accommodation status was no longer in issue).

4. *E.g., Treloggan v. Treloggan,* 699 P.2d 747, 748 (Utah 1985) (per curiam); *see Murray City v. Hall,* 663 P.2d 1314, 1320 (Utah 1983); Utah R.Civ.P. 56(e) (Repl.Vol. 9B, 1977 ed.).

5. 3 Am.Jur.2d *Affidavits* § 5 (1986).

6. *Id.* (footnotes omitted).

7. *Id.* at § 6.

January 8, 1979, Watts/Gregory loan. He went on to state that PCA believed that the loan was made primarily to the Wattses because his examination revealed that the Gregorys were unknown to PCA. The Wood affidavit sufficiently sets forth the means and sources of the information upon which Wood's conclusion concerning the January 1979 loan was based. Wood's summary statement concerning the other two loans for which the Wattses signed does not satisfy the "means and source" requirement noted above.

Affiant Vaughn Mills, president of PCA from late 1976 through July 1981, stated that the $48,890 loan would not have been made without the Wattses' appearing as co-makers on the loan and that he, in his capacity as a member of the loan committee, deemed the Wattses co-makers based upon their strength as co-makers.

Affiant Gerald Naylor, Salt Lake City PCA branch manager from early 1977 through June 1980, stated that based upon his participation in PCA's loan committee which approved the Watts/Gregory loans, and based upon discussions concerning the security for the same, "said loans would not have been made without said security and as Milo W. Watts and his wife as co-makers distinguished from a guarantor or an accommodation party."

■ Although the trial court may have been justified in striking other portions of Naylor's affidavit and part of Wood's affidavit and in ignoring Mills' affidavit since Mills' statements therein do not speak to the accommodation status of the Wattses, portions of Naylor's and Wood's affidavits are valid and relevant. Therefore, the trial court erred in not considering these exhibits. When the affidavits are considered, a conflict exists as to whether the Wattses signed as accommodation parties. When the evidence is conflicting as to whether a person signed commercial paper as an ac-

commodation party, a question of fact is presented which is to be determined by the trier of fact.[8]

The Wattses respond that the intent of the creditor or holder is irrelevant to the issue of whether a party to an instrument signs as an accommodation party. Under this theory, PCA's belief concerning whether or not the Wattses signed the note as accommodation parties is irrelevant, and therefore, since the Wattses claimed below that they signed as accommodation parties, there is no genuine issue of fact that should preclude summary judgment.

■ Whether a person is an accommodation party is a question of intent. In other words, it is a question of the intention of the person claimed to be an accommodation party, the person who would be the accommodated party, *and the person who was the holder of the paper when the alleged accommodation party signed.*[9]

■ In this case, PCA was the holder of the notes when the Wattses signed as co-makers. In accordance with the rule above set forth, PCA's intent is relevant to the issue of whether the Wattses signed as accommodation parties. Since, as discussed above, the evidence submitted by PCA places the Wattses' status in issue, the trial court erred in granting summary judgment in favor of the Wattses. Therefore, the case is reversed and remanded.

■ When it is necessary to remand a case for further proceedings, it is the duty of the reviewing court to address matters which will necessarily arise at trial.[10] Since the parties disagree upon what is and what is not relevant to prove an accommodation relationship, we offer the following guidance on the issue. A maker on a note proclaiming that he is an accommodation party and is therefore entitled to the privileges accorded accommodation parties under the law has the burden of proving his

8. 6 R. Anderson, Anderson on the Uniform Commercial Code § 3–415:13 (3d ed. 1984) [hereinafter cited as *Anderson* ].

9. *Anderson, supra* note 8, § 3–415:16, at 351.

10. *Salt Lake County v. Salt Lake City*, 570 P.2d 119, 121 n. 10 (Utah 1977) (citing Utah R.Civ.P. 76(a) (Repl. Vol. 9B, 1977 ed.) (repealed 1985)); Utah R.App.P. 30 (Repl. Vol. 9B, 1977 ed., Supp. 1986) (substantially identical to former Utah R.Civ.P. 76(a)).

accommodation character when it is at issue.[11] In some situations, the note itself may reflect that a particular party signed as an accommodation party. The fact that a party signs a note as a "maker" as opposed to an "accommodation maker" or a "cosigner" does not mean the party did not sign as a surety; it merely means that the alleged status may not be reflected on the face of the note. The fact that one party signs above another or to the left of another, without some serious indicia that the locus of the signature is to have any significance, is irrelevant.

■ When an alleged accommodation party's status cannot be gleaned from the note itself, as is often the case, the only other method available to establish the status is through parol evidence. Because this dispute turns upon PCA's intent and thus its notice of the Wattses' alleged accommodation status, parol evidence is admissible in this case pursuant to subsection 3–415(3).[12] The relevant parol evidence in this case is that evidence establishing the facts and circumstances at the time the notes were signed.[13]

■ Subsection 3–415(1) focuses upon the purpose for which an alleged accommodation party signed. Application of the "purpose test" to determine whether or not a party signed as an accommodation party, as indicated above,[14] turns upon the intent of the parties. In its brief, PCA contends that there is a secondary test to determine whether or not a party signs as an accommodation party: "Whoever received the proceeds of the loan is the 'principal obligor.'" Other courts and commentators denote this approach as the "benefit" or "proceeds" test.[15] Although some jurisdictions view the intent of the parties as only one factor to consider in determining whether a party is to be afforded the status of an accommodation party,[16] we believe a more accurate statement of the law is that whether or not a party to an instrument receives a benefit directly or indirectly, and if so to what extent, is one of several factors to be considered in determining the parties' intent. Since an accommodation party can receive a benefit under the code without undermining his status as a surety,[17] such evidence may only raise a permissible inference that a party is not an accommodation party.

■ Another factor which may be indicative of an accommodation status is whether the signature of the person claiming to be an accommodation party was necessary for the other party to receive the consideration given in exchange for the note.[18]

■ Finally, PCA correctly points out that a party cannot be an accommodation maker on a note given for his or her own debt.[19] The issue then is whether the January 1979 Watts/Gregory loan represented a new obligation delivered in satisfaction of the Wattses' previous debt. The following authority may be helpful:

It is generally held that the mere execution of a renewal note evidences the same debt by a new promise and does not constitute a payment or discharge of the original note but operates only as an extension of time for payment. It is true that one note may be accepted in pay-

**11.** *E.g., Lyons v. Citizens Commercial Bank,* 443 So.2d 229, 232 (Fla.Dist.Ct.App.1983).

**12.** Unless otherwise indicated, all references are to the Utah Uniform Commercial Code contained in title 70A (Repl. Vol. 7B, 1980 ed.).

**13.** *See Lasky v. Berger,* 536 P.2d 1157, 1159–60 (Colo.Ct.App.1975) (not selected for official publication) (certiorari denied by the Colorado Supreme Court on July 14, 1975).

**14.** *See supra* note 9 and accompanying text.

**15.** *See, e.g., Farmers State Bank v. Cooper,* 227 Kan. 547, 553, 608 P.2d 929, 934 (1980); *Com-*

*merce Union Bank v. Davis,* 581 S.W.2d 142, 144 (Tenn.Ct.App.1978).

**16.** *E.g., Lyons,* 443 So.2d at 231.

**17.** Such a construction is supported by comment 2 to section 3–415 of the official Uniform Commercial Code; *see also Leroy v. Marquette Nat. Bank,* 277 N.W.2d 351, 355 (Minn.1979).

**18.** *E.g., Farmers State Bank,* 227 Kan. at 553, 608 P.2d at 934; *Annot.,* 90 A.L.R.3d 342 (1979 & Supp. 1986).

**19.** *E.g., Kopff v. Miller,* 501 S.W.2d 532, 537 (Mo.Ct.App.1973).

ment of another, but a new note given without any new consideration to the same person for the same sum as the old one is not generally deemed a satisfaction thereof, unless so received and accepted.[20]

## III

■■■ The Wattses contend that they were released by section 3–606 when PCA discharged the Gregorys. Section 3–606 of the code provides, in pertinent part:

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

(a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person . . .; or

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

(2) By express reservation of rights against a party with a right of recourse the holder preserves

(a) all of his rights against such party as of the time when the instrument was originally due; and

(b) the right of the party to pay the instrument as of that time; and

(c) all rights of such party to recourse against others.

A division of authority exists concerning the scope of the reference to "any party" in subsection 3–606(1).[21] We believe that the defense of discharge found in that provision is properly characterized as a "suretyship defense."[22] Thus, it would appear that subsection 3–606(1), while including accommodation parties and other parties to an instrument in the position of sureties, does not apply to makers binding themselves only as principals.[23]

■■■ The crux of the Wattses' case is that they were released because PCA failed to reserve its rights against the Wattses when PCA released the Gregorys. A maker claiming to be an accommodation party and thus entitled to the defenses of subsection 3–606(1) has the burden of proving discharge under that subsection.[24]

■■■ Section 3–606 does not by its terms create any formal requirements for a reservation of rights to be effective except that it be "express." An express reservation is one that is clear, definite, explicit, plain, direct, and unmistakable, as opposed to a reservation that is inferred or implied.[25] PCA asserts that a careful reading of the settlement agreement between itself and the Gregorys discloses an express reservation of rights as against the Wattses since the agreement refers to PCA's foreclosure action.[26] In relevant part, the PCA/Gregory release agreement provides:

**20.** *Farmers Union Oil Co. v. Fladeland,* 287 Minn. 315, 319, 178 N.W.2d 254, 257 (1970) (citations omitted); *See also Peoples Nat. Bank v. Boyer,* 354 N.W.2d 559, 560 (Minn.Ct.App. 1984).

**21.** *Compare Lyons,* 443 So.2d at 231, *with Southwest Florida Production Credit Ass'n v. Schirow,* 388 So.2d 338, 339 (Fla.Dist.Ct.App.1980).

**22.** *See First Nat. Bank v. Egbert,* 663 P.2d 85, 86–87 (Utah 1983); *Wohlhuter v. St. Charles Lumber & Fuel Co.,* 62 Ill.2d 16, 20, 338 N.E.2d 179, 182 (1975).

**23.** *E.g., United States v. Unum, Inc.,* 658 F.2d 300, 304 (5th Cir.1981); *see Egbert,* 663 P.2d 85, 86–87; *Wohlhuter,* 62 Ill.2d at 20, 338 N.E.2d at 182.

**24.** *Anderson, supra* note 8, § 3–606:12 at 568–69.

**25.** *See Black's Law Dictionary* 521 (Rev. 5th ed. 1979).

**26.** The transcript from the hearing on the parties' motion for summary judgment includes the following excerpt:

THE COURT: Mr. Reporter, put that on the record to the effect that counsel for the plaintiff believes that the interpretation of the release instrument lends itself to a legal interpretation by the Court as to the extent of the release and is not subject to a factual determination of taking evidence as to what was meant by the provisions of the agreement which the Court would find somewhat vague, on the other hand subject to a legal interpretation. All right.

(B) To secure repayment of the Gregory/Watts Notes, Watts have previously given PCA a certain mortgage.... Said mortgage covers a four hundred eighty-one (481) acre piece of property (the "Gregory Farm") and other properties owned by Watts including his home (collectively the "Home Farm")....

....

(E) Gregorys and PCA desire to settle the differences among them and to resolve the Lawsuit insofar as it affects their interrelationships and to work together to conclude the litigation between them and the Watts.

....

(6) *Release of Gregorys.* From and after the execution hereof and the execution and delivery of the documents and cash described in paragraphs 1 through 5, PCA will and does hereby release and discharge Gregorys and each of them from any and all liability which they may have to PCA under the Gregory/Watts Notes, under the Gregory Note, under the Mortgage, under any security agreements, under the Assignment of Equity and under any other documents of security given to PCA by Gregorys.... From and after execution hereof, PCA's sole remedy for recovery of the sums *due it from Gregorys* under the Gregory/Watts Notes shall be through foreclosure sale of the *Gregory Farm and/or the Home Farm....*

(Emphasis added.) PCA correctly points out that under this agreement its sole remedy for recovery of the sums due it from the Gregorys under the Watts/Gregory notes shall be by foreclosure sale upon the farm and ranch. However, merely reserving a right of foreclosure against property owned by the Wattses is not an express reservation of rights against the Wattses on the instrument, as is required by section 3–606. The law of commercial paper establishes an obligation independent of the underlying debt.[27] By reserving its rights to foreclosure upon the Wattses' property, PCA did not reserve its rights against the

Wattses on their obligation on the note as makers. PCA also relies on its language that the Gregorys and PCA agreed to "*conclude*" the litigation as between them and the Wattses. PCA would have us imply that this was an express reservation of rights with regard to PCA's claims on the notes. Inasmuch as PCA obviously intended to pursue its foreclosure action and the Gregorys were not released from the Wattses' cross-claim because of the release agreement, this language does not support PCA's claim.

The parties to this action have extensively briefed the issues of whether the express reservation must be in writing and the applicability of U.C.A., 1953, §§ 15–4–1 to –7 (Repl. Vol. 2A, 1986 ed.). We need not reach these issues.

 Although it is generally accepted that a surety (accommodation party) need not be given notice of the reservation of rights,[28] the primary obligor in such a case, it seems, must be given such information as part of a release agreement. Moreover, a reservation of rights implicitly deals with the subject matter of a release, and such reservation must be made prior to or contemporaneously with the point in time when a release agreement takes effect.

 The PCA/Gregory release agreement contains an integration clause among its provisions. Since, as just noted, a reservation of rights is part of the subject matter of a release, and because such reservation may not be made subsequent to such release, parol evidence is inadmissible in this case to establish a reservation of rights. Because the release does not by its terms preserve PCA's rights on the notes as against the Wattses, we hold that no reservation of rights was made in this case.

### IV

PCA contends that, assuming the Wattses are accommodation parties, the Wattses cannot be released from any obligation other than any deficiency. PCA relies upon

---

27. *See, e.g.,* U.C.A., 1953, § 70A–3–413(1) (Repl. Vol. 7B, 1980 ed.).

28. *E.g., Hallowell v. Turner,* 95 Idaho 392, 394, 509 P.2d 1313, 1315 (1973).

the following authority to support its proposition:

> Any discharge under subsection (1) of Section 3–606 is available only "to the extent" that the conduct affects the accommodation party's obligation. This can be fairly readily determined where the conduct affects collateral. The question is, what was the value of the collateral of which the accommodation party was deprived or as to which his rights were otherwise diminished? [29]

PCA claims that the "extent" to which the Gregorys were released on the mortgage notes was only for any deficiency claim.

First, PCA's authority is directed not to the situation in this case, but to the situation when the holder unjustifiably impairs collateral under subsection 3–606(1)(b).[30] The only case we have found which cites the above-quoted authority is *Beneficial Finance Co. v. Lawrence.*[31] In that case, a defendant accommodation maker was claiming discharge under 3–606 due to the holder's failure to perfect its security interest which allegedly resulted in impairment to collateral pledged by the principal obligors.[32] The court there held that no release occurred since had the holder perfected the security interest in the collateral, its priority would be subordinate to other secured parties.[33] Indeed, all of the cases cited in support of the quoted proposition involve releases of collateral by the holder which was pledged by the primary obligor or a comaker.[34] The case at bar does not involve a release of collateral pledged by the principal obligors.

■ Second, as far as the Wattses are concerned, the Gregorys were not merely released from any deficiency which could have arisen upon foreclosure. PCA's release of the Gregorys in effect makes the Wattses and the Wattses' property liable for the entire debt. The release states that the Gregorys were released from "all liability which they may have to PCA under the Gregory/Watts notes." Section 3–606 provides in relevant part that the holder discharges any party to the instrument to the extent that the holder releases or agrees not to sue any party against whom the party has a right of recourse. Accordingly, when the person against whom a right of recourse exists is partially discharged, others who are also sureties are also discharged, but only to the extent that the rights have been impaired.[35] Since PCA failed to reserve its rights against the Wattses, the discharge was complete if the Wattses are accommodation parties.

## V

■ PCA's final point is that the only remaining issue is the amount due under the notes. PCA relies on the trial court's having previously granted PCA's partial summary judgment. Since the prepared order was never signed by the court and the ruling only appears as an unsigned minute entry, we have no jurisdiction to rule on this issue.[36]

The case is reversed and remanded. No costs awarded.

**29.** 2A F. Hart & W. Willer, *Commercial Paper Under the Uniform Commercial Code* § 13.24[4], at 13–110 (1987) (footnotes omitted).

**30.** *See id.* § 13.24, at 13–63.

**31.** 301 N.W.2d 114, 118 (N.D.1980).

**32.** *Id.* at 115–17.

**33.** *Id.* at 118.

**34.** The authors of PCA's authority cite *Langeveld v. L.R.Z.H. Corp.,* 130 N.J.Super. 486, 492, 327 A.2d 683, 686 (N.J.Ch.1974) (no discharge where delay in recording occasioned no loss of priority), *aff'd,* 137 N.J. Super. 557, 350 A.2d 76 (Ct. App.Div.1975), *rev'd,* 74 N.J. 45, 376 A.2d 931 (1977); *Christensen v. McAtee,* 256 Or. 333, 335, 473 P.2d 659, 660 (1970) (en banc) (co-maker not entitled to discharge where he failed to prove value of released collateral); *Lyons v. Citizens Commercial Bank,* 443 So.2d 229, 232–33 (Fla.Dist.Ct.App.1983) (assuming co-maker had standing to claim a release under 3–606 for release of collateral pledged by co-maker, no impairment shown by release where record failed to disclose value of collateral).

**35.** *First Arlington Nat. Bank v. Stathis,* 115 Ill. App.3d 403, 414, 71 Ill.Dec. 145, 153, 450 N.E.2d 833, 841 (1983).

**36.** *Utah State Tax Comm'n v. Erekson,* 714 P.2d 1151, 1152 & n. 1 (Utah 1986).

STEWART, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

HOWE, Justice, concurring:

I concur in reversing the summary judgment but express no opinion on other matters treated in the Court's opinion.