Jerome H. MOONEY, Plaintiff
and Respondent,

v.

GR AND ASSOCIATES, a Utah corpora-
tion, Grant H. Roylance, an individual,
Consolidated Mining and Milling, a
Utah corporation, C & H Investments, a
Utah partnership, Courtney Wrathall,
an individual, and Charles I. Hagan, an
individual, Defendants and Appellants.

No. 860067–CA.

Court of Appeals of Utah.

Dec. 10, 1987.

Brad L. Swaner, Salt Lake City, for de-
fendants and appellants.

Stephen R. Smith, Jr., Mooney & Smith,
Salt Lake City, for plaintiff and respon-
dent.

Douglas P. Simpson, Salt Lake City, for
GR & Associates, Roylance and Consolidat-
ed.

Before DAVIDSON, GARFF and
ORME, JJ.

## OPINION

GARFF, Judge:

Defendant/appellant Charles I. Hagan
appeals from a summary judgment in favor
of plaintiff/respondent Jerome H. Mooney,
in which Hagan was found liable for a
$457,819.95 judgment on a note; 15% inter-
est on the judgment from July 27, 1984;
costs of $201.50; and attorney fees of $11,-
400.00. We affirm.

In October 1976, Mooney sold real estate located in Salt Lake County to defendant C & H Investments (C & H), a partnership, by means of a uniform real estate contract. Hagan was president and defendant Courtney Wrathall was vice-president of C & H. Hagan executed a personal guaranty on the contract.

During August 1978, Mooney, C & H, Hagan and Wrathall agreed to convey the real property to defendant GR and Associates (GR). On August 17, 1978, Mooney, in exchange for his interest in the property, received a promissory note for $295,756.42. This note was executed by Hagan and Wrathall as partners in C & H and by defendant Grant H. Roylance as president of GR and of Consolidated Mining Corporation (Consolidated) and in his individual capacity. The note was to be secured by milling equipment owned by Consolidated.

To enable Roylance and his corporate entities to buy out C & H's interest in the real property, Roylance, on behalf of GR and Consolidated, simultaneously executed a promissory note for $468,709.00 to C & H and its partners, Hagan and Wrathall. Any payments which GR or Consolidated made on Mooney's note were to be credited as payments on C & H's note.

This transaction released Hagan from his personal guaranty on the October 15, 1976 real estate contract.

Guardian Title Company (Guardian) acted as the escrow agent for the August 17, 1978 transaction. Guardian, as an escrow agent, was acting on behalf of both parties and was not just Mooney's agent.[1] All parties understood that Guardian was to immediately file the security interest in Consolidated's mining equipment. The parties stipulated that they intended the security interest to be in first place on the full $500,000.00 market value of the unencumbered equipment, and so instructed Guardian. Guardian, however, did not file the

security interest until August 22, 1978, five days after the transaction closed.

On August 21, 1978, GR entered into a security agreement with Penguin Investments (Penguin), a non-party to this action, using the same milling equipment as collateral for a $1,500,000.00 debt. Penguin perfected its security interest in the equipment on August 21, 1978, the day before Guardian filed the parties' security interest.

Mooney received payments on the August 17, 1978 note for the months of September and October 1978. Around November 17, 1978, however, Mooney discovered that his security interest in the milling equipment was subordinate to that of Penguin, deemed his security impaired, and proceeded under the default provisions of the August 17, 1978 note to declare the entire principal sum due and payable. Mooney received one more payment on the note after the suit was initiated, receiving, in total, $12,000.00 on the note.

After this action was instituted, the parties discovered that Sandy State Bank had a prior perfected security interest in the milling equipment for $40,727.60, which had been filed on July 10, 1978.

The parties stipulated that C & H, Wrathall and Hagan reasonably relied upon the existence of a perfected, first-place security interest in executing the promissory note, that they never consented to Guardian's failure to properly perfect their security interest, and that they were acting under a mistake of fact in that they believed that the promissory note would be secured by the milling equipment and that the equipment would have a value equal to or greater than the amount of the note.

Mooney immediately attached Consolidated's assets, but took nothing because the security was insufficient to satisfy the prior security interests. Penguin eventually sold the secured property for $330,000.00 on April 9, 1980.

---

1. "In a broad sense, every depositary of an escrow is the agent of both parties, since for the purpose of making delivery upon the performance of the conditions, he is no less the agent of the grantee than the agent of the grantor. He is empowered to aid neither, being merely the conduit used in the transaction for convenience and safety; and he may, therefore, be looked upon as a special agent of both parties, with powers limited only to those stipulated in the escrow agreement." 28 Am.Jur.2d *Escrow* § 11 (1966).

The parties agreed to enter judgment against Roylance, GR and Consolidated for $310,642.00 on March 30, 1979. Wrathall and Hagan stipulated to this entry of judgment against the other defendants on April 2, 1979.

Both parties filed cross motions for summary judgment, Mooney claiming to be entitled to judgment based on the terms of the August 17 note, and defendants seeking to dismiss the complaint. The trial court awarded Mooney judgment on the note in the sum of $456,819.95 plus fifteen percent interest, costs of $201.50, and attorney fees of $11,400.00.

Hagan raises two issues on appeal: (1) Was he an accommodation party to the promissory note, and, therefore, able to claim discharge under Utah Code Ann. § 70A–3–606 (1986) in that Mooney unjustifiably impaired the collateral for the note? (2) Was he entitled to avoid the promissory note on grounds that there was a mutual mistake of material fact?

## I.

Utah Code Ann. § 70A–3–606 (1986), under which Hagan claims discharge, provides in pertinent part that:

> (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
>
> .    .    .    .    .
>
> (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

The Utah Supreme Court, in interpreting this section, stated that:

> [a] division of authority exists concerning the scope of the reference to "any party" in subsection 3–606(1) (footnote omitted). We believe that the defense of discharge found in that provision is properly characterized as a "suretyship defense" (footnote omitted). *Thus, it*

> *would appear that subsection 3–606(1), while including accommodation parties and other parties to an instrument in the position of sureties, does not apply to makers binding themselves only as principals.*

*Utah Farm Prod. Credit Ass'n v. Watts,* 737 P.2d 154, 160 (Utah 1987) (emphasis added). Thus, while accommodation parties have defenses available under section 70A–3–606, principal makers do not.[2]

Hagan argues that he should be characterized as an accommodation maker, and, therefore, discharged from his liability on the note under section 70A–3–606 because of unjustifiable impairment of collateral for the note. "A maker on a note proclaiming that he is an accommodation party and ... therefore entitled to the privileges accorded accommodation parties under the law has the burden of proving his accommodation character when it is at issue." *Watts,* 737 P.2d at 158–59. Therefore, Hagan has the burden of proving that he is an accommodation maker.

In *Utah Farm Prod. Credit Ass'n v. Watts,* the Utah Supreme Court outlined the following considerations to aid in determining whether a party is an accommodation maker. First, a particular party may be found to be an accommodation party if the note itself reflects that he signed as an accommodation party. *Watts,* 737 P.2d at 158. Second, when "an alleged accommodation party's status cannot be gleaned from the note itself, ... the only other method available to establish the status is through parol evidence." *Id.* at 159.

We first examine the relevant note, the August 17, 1978 note in favor of Mooney, to determine whether it reflects that Hagan signed as an accommodation party. This note specified that "[a]ny monies paid on this note by Consolidated Mining and Milling, Inc., shall be deducted from that Note dated August 17, 1978 in favor of C &

---

**2.** In *Valley Bank and Trust Co. v. Rite Way Concrete Forming, Inc.,* 742 P.2d 105 (Utah Ct. App.1987), we interpreted section 70A–3–606 and held that an absolute guarantor must explicitly waive his rights to collateral for section 3–606 discharge to be unavailable. *Valley Bank*

is distinguishable from the present case in that a guarantor is only secondarily liable for the obligation he has guaranteed and, therefore, has defenses available to him that a primary obligor does not have.

H Investment." This specification is an arrangement by which Roylance, GR, and Consolidated could buy out C & H's interest in the property by making the payments due on Mooney's note. It does not define, in any respect, C & H's, and, thus, Hagan's relationship to Mooney as an accommodation party. There is no other indication on the face of the note that Hagan signed as an accommodation party.

■ We next examine parol evidence to determine if, in fact, Hagan signed as an accommodation party. Whether a person is an accommodation party is ultimately a question of intent, e.g., the intent of the person claiming to be an accommodation party, the intent of the person who would be the accommodated party, and the intent of the person who was the holder of the paper when the alleged accommodation party signed. *Id.* at 158. Thus, the following factors are relevant in determining accommodation status: (1) whether or not a party to an instrument receives a benefit directly or indirectly, and if so, to what extent; (2) whether the signature of the person claiming to be an accommodation party was necessary for the other party to receive the consideration given in exchange for the note; and (3) whether the party claiming accommodation status is a maker on a note given for his or her own debt. "[A] party cannot be an accommodation maker on a note given for his or her own debt." *Id.* at 159.

■ We find first that Hagan received both direct and indirect benefits from the transaction, observing, like the trial court, that "Hagan benefited from the transaction by being released from his personal guarantee on the real estate contract," and that "his partnership was the recipient of a substantial promissory note from other participants in the transaction."

We next find that the parties intended that Hagan's signature was necessary on the note in favor of Mooney. Hagan's underlying obligation on the August 17, 1978 note stems from C & H's original obligation on the 1976 real estate contract. The 1978 note in favor of C & H, which GR and Consolidated were to pay off by mak-

ing payments to Mooney, indicates that C & H, and, thereby, Hagan, had not paid off the 1976 debt. Instead, the parties entered into the 1978 note in favor of C & H to buy out the partnership's interest in the Mooney property while including C & H as a signatory on the first 1978 note in favor of Mooney, rather than executing separate notes in which Roylance and his associated corporations were liable to Mooney and C & H for their respective interests in the property. This transaction indicates that the parties intended C & H, and, therefore, Hagan, as a partner in C & H, to be primarily liable along with Roylance, et al., on the first contract. Hagan has advanced no evidence to the contrary as to the parties' intent. Thus, the second factor works against Hagan's assertion of accommodation party status.

In analyzing the third factor, whether the party claiming accommodation status is a maker on a note given for his or her own debt, the *Watts* court cited the following authority as helpful:

> It is generally held that the mere execution of a renewal note evidences the same debt by a new promise and does not constitute a payment or discharge of the original note but operates only as an extension of time for payment. It is true that one note may be accepted in payment of another, but a new note given without any new consideration to the same person for the same sum as the old one is not generally deemed a satisfaction thereof, unless so received and accepted.

*Id.* at 159–160 (quoting *Farmers Union Oil Co. v. Fladeland*, 287 Mont. 315, 319, 178 N.W.2d 254, 257 (1970)). It is evident that the note on which Hagan is claiming accommodation status is, in fact, in substitution for the same debt for which he was a principal obligor, with no new consideration given for the debt. Therefore, he cannot claim accommodation status under the third factor.

Consequently, we find that Hagan was not an accommodation maker on the August 17, 1978 note, and, therefore, is not entitled to defenses under section 70A–3–

606. Thus, we do not reach the issue of unjustifiable impairment of the collateral.

## II.

Hagan next argues that he is entitled to avoid the August 17, 1978 promissory note on the grounds that there was a mutual mistake of material fact in that, as stipulated, the parties believed that the promissory note would be secured by a first interest in Consolidated's milling equipment with a value greater than the amount of the indebtedness, which, in fact, did not occur due to Guardian's late filing of the security interest.

█ That the parties so stipulated does not necessitate the legal conclusion that Hagan may avoid his obligations on the ground of mutual mistake.[3]

█ It is well settled that a contract is voidable if there is a mutual mistake of material fact. *Kiahtipes v. Mills,* 649 P.2d 9, 13 (Utah 1982); *Langston v. McQuarrie,* 741 P.2d 554, 557 (Utah Ct.App.1987). *See also Renner v. Kehl,* 150 Ariz. 94, 722 P.2d 262, 264–65 (1986). However, there can be no mutual mistake as to an event which is to occur in the future. The Colorado Supreme Court recognized this rule when it stated that:

> A party may rescind a contract when, at the time the contract is made, the parties make a mutual mistake about a material fact, the existence of which is a basic assumption of the contract. If the parties harbor only mistaken expectations as to the course of future events and their assumptions as to facts existing at the time of the contract are correct, recission is not proper. This rule is justified by the reality that parties to commercial con-

tracts rarely predict future events with total accuracy. Indeed, a contract often functions primarily to insulate the parties from uncertainty and to allocate the risk of future events.

*Beals v. Tri–B Assoc.,* 644 P.2d 78, 80 (Colo. Ct.App.1982) (citations omitted). *See also Super Valu Stores, Inc. v. C.E. Loveless,* 5 Wash.App. 551, 489 P.2d 368, 370 (1971); 17 Am.Jur.2d *Contracts* § 143 (1964).

The event which caused the alleged material mistake of fact was the failure to record the security interest, a fact which did not exist at the time the parties entered into the agreement, and which could not have been known until some time after the documents had been executed. While this is a failure of expectation, it is not a mutual mistake of material fact.

Although the parties were initially unaware of the prior Sandy State Bank interest in the equipment, neither has chosen to argue that it was the basis for a mutual mistake of fact, presumably because its interest in the amount of $40,727.60 was enough less than the $500,000.00 appraised value of the equipment that it would not have impaired security for the $295,756.42 obligation. Therefore, we hold that there was no mutual mistake of fact under which Hagan could avoid the note.[4] Affirmed.

DAVIDSON and ORME, JJ., concur.

---

**3.** Although courts are ordinarily bound by a stipulation between parties, they are not bound when points of law requiring judicial determination are involved. *First of Denver Mortgage Investors v. C.N. Zundel and Assoc.,* 600 P.2d 521, 527 (Utah 1979). *See also Bar 70 Enter., Inc. v. Tosco Corp.,* 703 P.2d 1297, 1306 (Colo. 1985).

**4.** In so holding, we echo the reasoning of the trial court, which stated:

> With regard to the contention that there was a mutual mistake of fact, the Court is of the

opinion that this position is not well taken. At the time the transaction was closed, the facts were as the parties expected them to be: GR & Associates and Roylance were owners of the property which was security for plaintiff's note, and an appropriate financing statement was delivered to the escrow agent with appropriate instructions for filing and both parties expected that the escrow agent would perform. The performance expected of the escrow agent was to be a future event. The failure of that escrow agent to perform as expected was a failure of expectation, not a

mistake of fact which existed at the time the transaction was closed. (The position of Penquin [sic] Investment did not arise until after the transaction between these parties was closed.) There does appear to have been a mistake of fact with reference to this prior position of Sandy State Bank, but neither party has argued that the apparent priority of Sandy State Bank had anything to do with the loss of the security since the value of the security at the time was adequate to cover any such claims and those of the plaintiff. It was the perfection of the Penquin [sic] claim after the transaction was closed, but prior to the filing of plaintiff's security interest, which gave rise to the ultimate loss of security insofar as plaintiff is concerned.