NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2601-10T3


JPMORGAN CHASE BANK, N.A.,

      Plaintiff-Respondent,

v.

JEFFCO CINNAMINSON CORPORATION
D/B/A STAN ESPOSITO FINE CARS
and PAUL T. ANDREWS,

      Defendants-Appellants,

and

ALFRED SCIUBBA,

      Defendant.

_____

Submitted March 7, 2012 – Decided March 27, 2012

Before Judges J. N. Harris and Haas.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-002840-09.

Marchetti Law, P.C., attorneys for appellants (Anthony L. Marchetti, Jr., on the brief).

Maselli Warren, P.C., attorneys for respondent JPMorgan Chase Bank, N.A. (Paul J. Maselli, of counsel and on the brief).

PER CURIAM

This appeal concerns a national bank's alleged imperfect release of security interests in two high performance automobiles — a Ford GT40 (the Ford GT) and a Ferrari Scaglietti (the Ferrari) — held as collateral, without first waiting for two payoff checks to clear. Plaintiff JPMorgan Chase Bank, N.A. (JPMorgan) irreversibly released its liens and returned the title papers for the automobiles to the owner's consignee, only to learn just days later that both checks were dishonored for insufficient funds. Defendants Jeffco Cinnaminson Corporation (Jeffco) and Paul T. Andrews claim that JPMorgan's precipitous conduct resulted in the impairment of collateral, which requires the discharge of their obligations to the bank.

Jeffco and Andrews appeal from the December 10, 2010 judgment entered in favor of JPMorgan for $305,215.33 plus $40,822.52 in reallocated attorneys fees and costs. We reverse and remand for further proceedings.

I.

A.

We begin with familiar principles of law:

> Our review of the meaning of a statute is de novo, and we owe no deference to the interpretative conclusions reached by the trial court . . . . Zabilowicz v. Kelsey,

200 <u>N.J.</u> 507, 512-13 (2009); <u>see also</u> <u>Manalapan Realty, L.P. v. Twp. Comm.</u>, 140 <u>N.J.</u> 366, 378 (1995). In determining whether summary judgment was properly granted based on the record, we apply the same standard governing the trial court -- we view the evidence in the light most favorable to the non-moving party. <u>See</u> <u>Henry v. N.J. Dep't of Human Servs.</u>, 204 <u>N.J.</u> 320, 330 (2010); <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 <u>N.J.</u> 520, 523 (1995); <u>see also</u> <u>R.</u> 4:46-2(c).

[<u>Wilson ex rel. Manzano v. City of Jersey City</u>, ___ <u>N.J.</u> ___, ___ (2012)(slip op. at 5).]

Here, the Law Division granted summary judgment against Jeffco and Andrews, the non-moving parties. With these principles in mind, we turn to the facts, viewing them in the light most favorable to those defendants.

### B.

In late 2005, Jeffco and Andrews applied to JPMorgan, through the Jim Golden Ford-Lincoln-Mercury car dealership, for a loan to pay for Jeffco's acquisition of the Ford GT. On December 6, 2005, Jeffco and Andrews signed a document entitled, "Promissory Note and Security Agreement — Consumer Paper," in favor of JPMorgan in the amount of $177,373, which referred to Andrews as a "co-borrower." In a separate disclosure entitled, "Cosigner Notice," Andrews was advised that he was "being asked to guarantee [the] debt," and he signed the document above a line labeled, "Cosigner's Signature."

3

In July 2006, a similar transaction occurred involving the Ferrari. On July 27, 2006, Jeffco and Andrews signed a document entitled, "New Jersey Retail Installment Contract," in favor of Ferrari Maserati of Central N.J. agreeing, as "Buyer and Co-Buyer," to pay a total of $255,507 for the Ferrari. Andrews again signed a separate "Cosigner Notice," which contained the identical boilerplate language as the December 2005 disclosure. The retail installment sale contract evidenced by these instruments was assigned to JPMorgan.

In due course, both automobiles were entrusted to automobile dealer Alfred Sciubba for the purpose of finding a buyer for each vehicle. Andrews and Sciubba had known each other for several years and previously engaged in similar arrangements. The record does not contain any writings evidencing the nature of the bailment and it appears that Sciubba and Andrews transacted business mostly through oral handshake agreements. Sciubba owned and operated a specialty car business at a number of locations under the trade name Auto Toy Store, which, among other things, sold motor vehicles on consignment.

At his deposition, Sciubba testified that he regularly accepted consignments from Andrews's personal stock of automobiles, but that the placements of the Ford GT and Ferrari

were not true consignments because the vehicles were owned by Jeffco, and Sciubba claimed to have a part ownership interest in Jeffco. Andrews disputes this. However, according to Sciubba, because he was tasked to sell his own automobiles — albeit titled in the name of Jeffco — these were not consignment transactions, at least as far as he was concerned.

In general, when Sciubba (or his staff) sold a consigned automobile, it was his responsibility, through the Auto Toy Store, to obtain clear title for the buyer. If the automobile had been financed and there was a lien on the title, it was Sciubba's responsibility to forward the unpaid balance due on the indebtedness to the creditor, usually a bank or credit union. In return, the creditor endorsed the lien paid and returned the title papers to Sciubba, who would then obtain new title papers and forward them to the buyer. Among the documents Sciubba required from consignors to facilitate this payoff process was a power of attorney authorizing the procedure.

In the summer of 2006, a prospective buyer for the Ford GT emerged. At that time, Sciubba still maintained a Jeffco checking account and was in possession of some of its blank checks.[1] One of Sciubba's employees prepared and mailed to

---

[1] The record contains documentary evidence suggesting that Sciubba had transferred his entire interest in Jeffco to Andrews

(continued)

JPMorgan a payoff check from the Jeffco account.  This employee also signed Andrews's name to a document entitled, "Authorization For Payoff" and directed the bank to send the "lien release" to Jeffco at an address in West Berlin, New Jersey, which was one of Sciubba's Auto Toy Store locations.

On August 29, 2006, JPMorgan received the check in the amount of $162,066.51.  On September 1, 2006, before waiting to ensure that the check cleared, JPMorgan endorsed its lien as paid, and mailed the Ford GT's title papers to the designated address.  Presumably, upon receipt, clear title to the automobile was delivered to the purchaser.

The Jeffco check, however, never cleared.  It was dishonored due to insufficient funds on September 6, 2006.  Thus, not only did the principal amount of the indebtedness remain unpaid, but interest on the loan continued to accrue.  Andrews did not learn of these circumstances until a representative of JPMorgan later called him saying that the bank wanted a payment for the loan.

The Ferrari transaction took a similar course.  After a purchaser paid for that automobile, a Jeffco check in the amount of $243,170 was prepared by one of Sciubba's employees and sent

(continued)
in December 2004 and his right to utilize this checking account eighteen months later was dubious.

to JPMorgan on December 15, 2006. JPMorgan received the check four days later. One day after that, it endorsed the lien as paid, and mailed the Ferrari's title papers to the West Berlin address. The check did not clear. It was dishonored on December 29, 2006, for insufficient funds.

Thus, as far as JPMorgan was concerned, it now held two unpaid loans in Jeffco's and Andrews's names, both of which were now unsecured. After Andrews was made aware of this turn of events, he and Sciubba attempted to resolve their multi-faceted dispute. Not only were these underlying loans in arrears, but Andrews had not been paid his appropriate share of the automobiles' net profits.

In July 2007, Andrews and Sciubba executed an agreement entitled, "Partial Agreement of Understanding," which provided that Sciubba would "make complete and timely monthly payments on any and all amounts due and owing on the . . . Ferrari . . . and the Ford GT." Sciubba performed these obligations for approximately one year. In September 2008, supposedly due to challenging economic conditions, Sciubba closed the Auto Toy Store and stopped paying the loans. In short order, JPMorgan commenced this lawsuit to recover the amounts due.

The record is unclear when JPMorgan actually filed its initial complaint. However, an amended complaint was filed in

February 2009, naming Jeffco, Andrews, and Sciubba as defendants. Jeffco and Andrews defended on the ground, among others, that because JPMorgan had failed to protect the collateral, their two loans were discharged. They filed cross-claims against Sciubba, and also asserted a counterclaim against JPMorgan claiming negligence in the handling of the collateral. In mid-2009, JPMorgan and Sciubba settled their part of the dispute and entered into a stipulation of settlement. This agreement called for Sciubba to make scheduled payments to JPMorgan for one year, and then make a balloon payment for the balance due.

In September 2010, JPMorgan filed a motion for partial summary judgment. Jeffco and Andrews responded with a cross-motion for summary judgment. As part of their response and cross-motion, Jeffco and Andrews submitted Thomas Bonneville's expert report and opinion. Bonneville opined that JPMorgan's release of the liens violated financial industry standards and was contrary to JPMorgan's policies and procedures. Bonneville stated that not only should the liens not have been released until JPMorgan could verify that the loans had been paid in full with good funds, but JPMorgan failed to properly verify that the documents submitted along with the payoff checks —- the power of attorney and Authorization For Payoff -— were genuine.

Furthermore, Bonneville contended that JPMorgan failed to properly monitor and manage the Jeffco loan portfolio after the first payoff check (for the Ford GT) bounced.

In an oral decision, the Law Division recited the mostly undisputed facts, ultimately holding the following:

> My best understanding of the facts here is that [JPMorgan] implicitly knew that [the entity transmitting title to the vehicles was in the business of selling vehicles] because [it] received a check from Auto Toy Store, an entity that appeared in all respects to be a business that was in the business of selling motor vehicles.
>
> It therefore reasonably concluded, or should have concluded, that [these] vehicle[s] had been consigned to an entity that was in the business of selling motor vehicles; that the only way that the vehicles could have reached that location was through the actions of Mr. Andrews in allowing the vehicle[s] to be placed into the stream of commerce through this motor vehicle dealership; and that in consequence, to the extent that payment was presented to the bank, that payment was, from the dealership, adequate and sufficient to constitute the basis for the release of title.
>
> In terms of the release of the title in each of the two instances to the Auto Toy Store in connection with the bona fide purchaser, . . . Andrews and Jeffco can't be heard to complain about that release because they set in motion the very facts that led to the consignment of the vehicle to this dealership. They can't therefore assert that they are entitled to the same protection under [N.J.S.A.] 12A:3-605 where the bank has impaired their collateral

because under Section I of that section, they created the very circumstance that produced the basis for the discharge of the collateral.

. . . .

For those reasons, the Court finds that the defense that's asserted by the defendant[s] to the indebtedness is simply based upon the facts that are acknowledged by the defendant[s], even where the Court construes the facts in the light most favorable to the defendant[s], is not available to [them] because the defendant[s] acknowledge[] this knowing consignment of the vehicle[s] to the Auto Toy Store.

For all of those reasons then, the Court concludes that the motion for partial summary judgment by JPMorgan Chase Bank as against Jeffco and Andrews must be granted. There was an appropriate and proper and mandatory release of the collateral in connection with the sale of [these] vehicle[s] by an entity appointed by Andrews acting as the Jeffco principal, that consigned [these] vehicle[s] for sale —— which would result in a sale to a bona fide purchaser who presented fair and reasonable documentation to the bank in regard to payment, and therefore there was an obligation to release the title instrument.

A few weeks later, the court entered a judgment against Jeffco and Andrews adding approximately $40,000 in attorneys' fees to the unpaid balance of the loans. This appeal followed after a default judgment was entered in favor of Jeffco and Andrews against Sciubba on the cross-claims.

10                                                          A-2601-10T3

II.

The parties have chosen to engage their dispute at the arcane intersection of Chapters Two (Sales), Three (Negotiable Instruments), and Nine (Secured Transactions) of New Jersey's Uniform Commercial Code (the UCC). We are not sanguine that their legal analyses properly harmonize the disparate purposes of each chapter of the UCC. First, the parties' arguments about the statute and the limited decisional law in this state relating to consignments revolve around situations concerning priority disputes between buyers and consigners, not, as here, between secured creditors and consigners. Second, the UCC does not exclusively control the duties of secured creditors vis-à-vis the management, control, and release of their liens. See N.J.S.A. 39:10-10 (providing that when a security agreement noted on a certificate of ownership has been performed the secured party shall deliver to the buyer the certificate of ownership thereto, with proper evidence of satisfaction of the termination of the security interest). Cf. N.J.S.A. 39:10-9 (noting that its provisions relating to security interests do not "apply to security interests in motor vehicles which constitute inventory held for sale, but such interests shall be subject to chapter 9 of Title 12A of the New Jersey Statutes.").

JPMorgan relies upon Martin v. Nager, 192 N.J. Super. 189 (Ch. Div. 1983) and N.J.S.A. 12A:9-320(a) for the proposition that "the UCC entitles buyers in the ordinary course of business to take ownership of automobiles without being subject to liens." In so many words, JPMorgan argues that whenever an "innocent purchaser" is involved in the acquisition of an automobile, the rights of a secured lender must almost-instantaneously (and inexorably) bend to the will of the buyer. Even if that were nothing more than an exaggerated overstatement, it is not what occurred in this case, at least from JPMorgan's vantage point.

JPMorgan justifies the breakneck speed of its lien-releasing activities based upon the mere appearance of an alleged good faith purchaser on the scene. However, JPMorgan had no knowledge about the identity or status of the purchasers at the time of the futile payoffs. When bank employees received the first payoff check from Jeffco, with its accompanying request to release the lien that had allegedly been signed by Andrews, JPMorgan was neither aware that the Ford GT had, in fact, been sold, nor was it privy to any other details of the transaction between the Auto Toy Store and the buyer.

In fact, contrary to the Law Division's conclusion, JPMorgan could not have "implicitly kn[own] that [the entity

transmitting title to the vehicles was in the business of selling vehicles] because [JPMorgan] received a check from Auto Toy Store, an entity that appeared in all respects to be a business that was in the business of selling motor vehicles." JPMorgan never received a check from the Auto Toy Store. Instead, the check came from Jeffco, which from the evidence available at the time was not an entity that was in the business of selling motor vehicles.[2] For all JPMorgan's employees knew, there was no sale involved at all, and Jeffco simply was restructuring its liabilities and changing lenders. The UCC does not require a secured lender to blindly release a lien without conducting reasonable due diligence, including ensuring that the proffered payoff is sufficient to extinguish the outstanding amount due on the loan or there are other sufficient lawful grounds for freeing the collateral.

Martin does not hold otherwise. In that case, the only issue that was decided involved the rights of a buyer and seller of a consigned automobile where the consignee converted the purchase price and became insolvent. Martin, supra, 192 N.J.

---

[2] The Jeffco checks that Sciubba's employee sent to JPMorgan are not part of the appellate record. We do not know, for example, whether those checks contained Jeffco's trade name, Stan Esposito Fine Cars, which might have been an indication that the money to pay off each loan came from an automobile dealer. Even if that were the case, however, it would not have demonstrated that the buyer was a "bona fide purchaser."

Super. at 193. The court did not address the rights of a secured creditor and did not hold that a lien holder must endorse the lien paid-in-full before making sure that the loan is, in fact, paid in full.

N.J.S.A. 12A:9-320(a) also is inapplicable to JPMorgan's actions. This statute provides, in pertinent part, as follows:

> Except as otherwise provided in subsection (e), a buyer in ordinary course of business, other than a person buying farm products from a person engaged in farming operations, takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence.
>
> [N.J.S.A. 12A:9-320(a)(emphasis added).]

Under N.J.S.A. 12A:9-315(a)(1) and (2), a perfected security interest continues in collateral upon any disposition, unless an exception in the UCC applies. N.J.S.A. 12A:9-320(a) is one such exception because it automatically discontinues the security interest so that the goods purchased are no longer encumbered by the lender's security interest. The effect ensures that a buyer acquires the goods with clear title.

The purpose of N.J.S.A. 12A:9-320(a) is to facilitate sales transactions between a debtor and its customers. If the debtor's customers can freely purchase, without having to worry about security interests, the debtor's cash flow is more likely

A-2601-10T3

enhanced by the concomitant ability to pay the indebtedness to the secured party in a timely fashion.

The security interests in this case were created by Jeffco and Andrews, not by the Auto Toy Store. The buyers of the Ford GT and Ferrari were dealing with the Auto Toy Store. Thus, those buyers would take free of any security interest created by Auto Toy Store, but not those created by Jeffco and Andrews. See Ocean Cnty. National Bank v. Palmer, 188 N.J. Super. 509 (App. Div. 1983) (applying former N.J.S.A. 12A:9-307(1), the source of N.J.S.A. 12A:9-320(a)).

Furthermore, the statute describes nothing about the secured party's duty to release its perfected security interest and is silent as to the speed within which that must be accomplished. In this case, there is no evidence of a need for a speedy release of JPMorgan's security interests. The record neither identifies the buyers of the Ford GT and Ferrari nor discloses their demands for obtaining the paperwork necessary to comply with the title transfer provisions of the motor vehicle certificate of ownership law, N.J.S.A. 39:10-1 to -25. Had JPMorgan waited a few more business days before robotically processing the lien releases, its discovery of the checks' dishonor might have enabled Jeffco and Andrews to prevent the conversion of the purchase proceeds. We, of course, cannot know

A-2601-10T3

the outcome of this hypothetical scenario. However, in light of Bonneville's expert opinions, we cannot say that Jeffco and Andrews would have inevitably suffered the same harm. That determination is for the trier of fact to make.

JPMorgan further argues that Jeffco and Andrews are co-makers of the instruments that evidence the loans related to the Ford GT and Ferrari. Accordingly, it claims that they are not entitled to raise the defense of impairment of collateral under N.J.S.A. 12A:3-605, because such defense is available only to accommodation parties (see N.J.S.A. 12A:3-419), not to makers (see N.J.S.A. 12A:3-103(a)(5)) of instruments. The UCC's impairment of collateral section, in pertinent part, provides as follows:

> e. If the obligation of a party to pay an instrument is secured by an interest in collateral and a person entitled to enforce the instrument impairs the value of the interest in collateral, the obligation of an indorser or accommodation party having a right of recourse against the obligor is discharged to the extent of the impairment. The value of an interest in collateral is impaired to the extent the value of the interest is reduced to an amount less than the amount of the right of recourse of the party asserting discharge, or the reduction in value of the interest causes an increase in the amount by which the amount of the right of recourse exceeds the value of the interest. The burden of proving impairment is on the party asserting discharge.

f. If the obligation of a party is secured by an interest in collateral not provided by an accommodation party and a person entitled to enforce the instrument impairs the value of the interest in collateral, the obligation of any party who is jointly and severally liable with respect to the secured obligation is discharged to the extent the impairment causes the party asserting discharge to pay more than that party would have been obliged to pay, taking into account rights of contribution, if impairment had not occurred. If the party asserting discharge is an accommodation party not entitled to discharge under subsection e. of this section, the party is deemed to have a right to contribution based on joint and several liability rather than a right to reimbursement. The burden of proving impairment is on the party asserting discharge.

g. Under subsection e. or f. of this section, impairing value of an interest in collateral includes failure to obtain or maintain perfection or recordation of the interest in collateral, release of collateral without substitution of collateral of equal value, failure to perform a duty to preserve the value of collateral owed, under chapter 9 or other law, to a debtor or surety or other person secondarily liable, or failure to comply with applicable law in disposing of collateral.

[N.J.S.A. 12A:3-605(e), (f), and (g)].

Also,

[a] person signing an instrument is presumed to be an accommodation party and there is notice that the instrument is signed for accommodation if the signature is an anomalous indorsement or is accompanied by

words indicating that the signer is acting as surety or guarantor with respect to the obligation of another party to the instrument. Except as provided in 12A:3-605, the obligation of an accommodation party to pay the instrument is not affected by the fact that the person enforcing the obligation had notice when the instrument was taken by that person that the accommodation party signed the instrument for accommodation.

[N.J.S.A. 12A:3-419(c).]

In light of these provisions, we conclude that there is a factual dispute over Andrews's status. Although he signed both the promissory note for the Ford GT and the retail installment sale contract for the Ferrari, he was provided the Cosigner Notice in both instances, which alerted him that he was "being asked to guarantee the debt." These words alone might qualify, in the language of the statute, as "indicating that the signer is acting as surety or guarantor with respect to the obligation of another party to the instrument." Ibid. Accordingly, summary judgment was not appropriate as the means to determine whether Andrews was an accommodation party.

As for Jeffco, its ability to argue for a discharge pursuant to the impairment of collateral doctrine is controlled by N.J.S.A. 12A:3-605(f). This section applies to "the obligation of any party who is jointly and severally liable," not just accommodation parties, and permits a discharge "to the

extent the impairment causes the party asserting discharge to pay more than that party would have been obliged to pay." Ibid. (emphasis added). Not only did the Law Division not reach this issue, but the evidence presented on summary judgment was insufficient to warrant a judgment in JPMorgan's favor as a matter of law.

Finally, JPMorgan argues that regardless of whether it impaired the collateral, both Jeffco and Andrews waived the defense. It, along with the Law Division, asserted that because Jeffco and Andrews had placed the Ford GT and Ferrari in Sciubba's custody and control ("in the stream of commerce"), which resulted in Sciubba's mishandling of the payoff checks, they are deemed to have waived remedies for the impairment of collateral. We view this evidence of waiver, by itself, to be insufficient to warrant an "unequivocal" waiver as required by Langeveld v. L.R.Z.H. Corp., 74 N.J. 45, 54 (1977) and its progeny.

In Langeveld, the Court directly addressed the effect of particular contract language on a guarantor's right to unimpaired collateral. Such a result "should be permitted only where the instrument of guaranty specifically frees the creditor from liability for such impairment." Id. at 53. As a result, the Court adopted the rule that when faced with a claim that a

guaranty was meant to eradicate every right of a guarantor and grant the creditor absolute immunity as to the collateral, a court must strictly construe the language of the guarantee. Ibid.

Here, by analogy, the mere entrustment of the Ford GT and Ferrari to Sciubba did not, as a matter of law, constitute an unequivocal waiver of Jeffco's and Andrews's rights to unimpaired collateral. The two separate acts — entrustment of the cars and waiver of a future defense — are independent of each other. We do not exclude the possibility that at trial, JPMorgan could establish grounds for waiver, but the summary judgment record was wholly insufficient to warrant a conclusion to the contrary.

In sum, we conclude that the Law Division improvidently granted summary judgment in favor of JPMorgan. Whether Jeffco or Andrews will be entitled to discharge the loans owed to JPMorgan remains to be seen. Jeffco and Andrews will shoulder the burden of proof on the impairment of collateral defense, and JPMorgan will be entitled to present evidence demonstrating its waiver. The trier of fact will also be obliged to determine, even if an impairment of collateral occurred, the extent, if any, of the impairment in accordance with N.J.S.A. 12A:3-605. We recognize that the issues in this case are thorny and will

20                                                           A-2601-10T3

present serious challenges to the court, to the parties, and to the trier of fact.[3] We are, nonetheless, confident that all will fulfill their assigned roles in the resolution of this dispute.

Accordingly, summary judgment in favor of JPMorgan is reversed; the reallocation of counsel fees is vacated without prejudice; and the matter is remanded to the Law Division for further proceedings consistent with the views expressed in this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] An official comment to N.J.S.A. 12A:3-605 suggests that the impairment of collateral defense is "greatly diminished" because "[i]t is standard practice to include . . . a waiver [of a right to discharge] in notes prepared by financial institutions or other commercial creditors. Thus, the defense appears only in "the occasional case in which the note does not include . . . a waiver clause and the person entitled to enforce the note nevertheless takes actions that would give rise to a discharge without obtaining the consent of the secondary obligor." N.J.S.A. 12A:3-605, UCC Comment 9. If JPMorgan's promissory note or retail installment sale contract provides a basis to argue waiver, we do not preclude the employment of this argument, and leave it to the Law Division to decide the matter.

A-2601-10T3